

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-12-00457-CV

TRAVIS COUNTY, TEXAS; TJFA, LP; AND NORTHEAST
NEIGHBORS COALITION, APPELLANTS

V.

TEXAS COMMISSION ON ENVIRONMENTAL QUALITY AND WASTE
MANAGEMENT OF TEXAS, INC., APPELLEES

On Appeal from the 126th District Court
Travis County, Texas
Trial Court No. D-1-GN-10-001826, Honorable Stephen Yelenosky, Presiding

April 29, 2014

## MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

This is a suit for judicial review of the order of appellee Texas Commission on Environmental Quality, modifying appellee Waste Management of Texas, Inc.'s solid-waste-disposal permit. Appellants Travis County, TJFA, LP, and Northeast Neighbors Coalition (NNC) appeal from the district court's judgment affirming the order of the Commission. We will affirm the district court's judgment.

Background

The Commission's order under appeal permitted expansion of the Austin Community Landfill (ACL), which is an existing Type I Municipal Solid Waste Disposal Landfill consisting of 288.6 acres located at 9900 Giles Road, approximately 250 feet north of the intersection of Giles Road and US Highway 290 in Travis County. This landfill was first permitted to accept waste in 1970. The property contains a section of the landfill, the Industrial Waste Unit (IWU), which accepted industrial waste in the early 1970s. The landfill property is bordered on the south by the closed Travis County Landfill, and on the north by the Sunset Farms Landfill, which is scheduled to cease accepting waste on November 1, 2015. Waste Management requested a permit amendment through application MSW No. 249D to expand the landfill laterally by adding 71.11 acres to the existing permitted boundary, increasing the total permitted area to 359.71 acres. Waste Management's amendment request contemplates maintaining the current maximum elevation of 740 feet above mean sea level. The proposed lateral expansion would increase the permitted disposal capacity from 26,679,840 cubic yards to approximately 39,137,000 cubic yards. This would extend the waste disposal life of the landfill to 2025.

Access to the landfill is provided by a site entrance road on Giles Lane. Traffic counts at the driveway and Giles Lane show that the landfill currently generates 390 vehicles per day. Based on annual growth rates from the Capital Area Council of Governments'[1] Regional Solid Waste Management Plan, traffic is expected to increase

---

[1] Capital Area Council of Governments is the regional solid waste planning agency for a ten-county region including Travis County.

to 667 vehicles per day by 2025. Authorized waste currently being accepted at the landfill amounts to approximately 447,658 tons per year. Waste Management's plan proposes acceptance of 673,183 tons per year of authorized waste by the final full year of site operations.

An administrative hearing on the merits of the permit for expansion was held March 30 through April 13, 2009. The administrative law judge (ALJ) issued the proposal for decision (PFD) and proposed order on July 21, 2009. The ALJ submitted a revised proposed order and explanatory letter on September 8, 2009, followed by an additional explanatory letter on September 11, 2009. The Commission issued an interim order on October 20, 2009, remanding the application to the State Office of Administrative Hearings and instructing the ALJ to modify specific substantive proposed findings of fact and conclusions of law. Preliminary and evidentiary hearings on the remanded issue were held in October and December 2009 and a supplemental PFD and supplemental proposed order were issued on January 5, 2010. The Commission approved the application and issued the agency's final order on March 15, 2010.

Appellants moved for rehearing, and sought judicial review in district court when their motions for rehearing were denied by operation of law. A hearing in the district court was held in July 2012. In August 2012, the district court upheld the granting of the permit to expand the landfill. The district court did find the Commission erred by directing the ALJ to revise certain proposed findings and conclusions, but concluded the error was harmless.

Following the district court's ruling, appellants filed notice of appeal, bringing several issues before us.

## Applicable Law

The substantial-evidence standard of the Texas Administrative Procedure Act (APA) governs our review of the Commission's final order. TEX. GOV'T CODE ANN. § 2001.174 (West 2008). The APA authorizes reversal or remand of an agency's decision that prejudices the appellant's substantial rights because the administrative findings, inferences, conclusions, or decisions (1) violate a constitutional or statutory provision, (2) exceed the agency's statutory authority, (3) were made through unlawful procedure, (4) are affected by other error of law, or (5) are arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. TEX. GOV'T CODE ANN. § 2001.174(2)(A)-(D),(F). Otherwise, we may affirm the administrative decision if we are satisfied that "substantial evidence" exists to support it. TEX. GOV'T CODE ANN. § 2001.174(1),(2)(E). Instances may arise, however, in which the agency's action is supported by substantial evidence, but is nonetheless arbitrary and capricious. *Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.,* 665 S.W.2d 446, 454 (Tex. 1984).

We review the agency's legal conclusions for errors of law and its factual findings for support by substantial evidence. *Heat Energy Advanced Tech., Inc. v. West Dallas Coal. for Envtl. Justice,* 962 S.W.2d 288, 294-95 (Tex. App.—Austin 1998, pet. denied). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to

4

support a conclusion of fact." *Lauderdale v. Texas Dep't of Agric.,* 923 S.W.2d 834, 836 (Tex. App.—Austin 1996, no writ) (quoting *Pierce v. Underwood,* 487 U.S. 552, 564-65, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (internal quotation marks omitted)). We consider the reliable and probative evidence in the record as a whole when testing an agency's findings, inferences, conclusions, and decisions to determine whether they are reasonably supported by substantial evidence. *Graff Chevrolet Co. v. Texas Motor Vehicle Bd.,* 60 S.W.3d 154, 159 (Tex. App.—Austin 2001, pet. denied); *see* TEX. GOV'T CODE ANN. § 2001.174(2)(E) (West 2008).

We presume that the Commission's order is supported by substantial evidence, and appellants bear the burden of proving otherwise. *Charter Med.*, 665 S.W.2d at 453. The burden is a heavy one; even a showing the evidence preponderates against the agency's decision will not be enough to overcome it, if there is some reasonable basis in the record for the action taken by the agency. *Id.* at 452. Our ultimate concern is the reasonableness of the agency's order, not its correctness. *Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer,* 662 S.W.2d 953, 956 (Tex. 1984).

Whether the agency's order satisfies the substantial-evidence standard is a question of law. *Id.* Thus, the district court's judgment that there was substantial evidence supporting the Commission's final order is not entitled to deference on appeal. *Texas Dep't of Pub. Safety v. Alford*, 209 S.W.3d 101, 103 (Tex. 2006) (per curiam). On appeal from the district court's judgment, the focus of the appellate court's review, as in the district court, is on the agency's decision. *Montgomery Indep. Sch. Dist. v. Davis,* 34 S.W.3d 559, 562 (Tex. 2000); *Tave v. Alanis,* 109 S.W.3d 890, 893 (Tex. App.—Dallas 2003, no pet.).

5

The Legislature has charged the Commission with regulating the management of solid-waste disposal, and the Commission has adopted rules for issuing permits for municipal solid-waste disposal facilities. TEX. HEALTH & SAFETY CODE ANN. §§ 361.002, 361.011 (West 2010) (establishing purpose of Solid Waste Disposal Act is to safeguard people's health, welfare, and physical property and to protect environment by controlling management of solid waste), (granting powers and duties necessary or convenient to carrying out responsibilities for managing municipal solid waste). When there is vagueness, ambiguity, or room for policy determinations in a statute or regulation, we generally defer to the agency's interpretation unless it is "plainly erroneous or inconsistent with the language of the statute, regulation, or rule." *TGS-NOPEC Geophysical Co. v. Combs,* 340 S.W.3d 432, 438 (Tex. 2011). But this deference to the agency's interpretation is not conclusive or unlimited; we defer only to the extent that the agency's interpretation is reasonable*. Id.* We construe administrative rules in the same manner as statutes, using traditional principles of statutory construction*. Id.*

When we construe administrative rules and statutes, our primary objective is to give effect to the intent of the issuing agency and Legislature, "which, when possible, we discern from the plain meaning of the words chosen." *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006) (addressing statutory construction); *see Rodriguez v. Service Lloyds Ins. Co.,* 997 S.W.2d 248, 254 (Tex. 1999) (addressing rule construction). We consider statutes and rules as a whole rather than their isolated provisions. *TGS-NOPEC,* 340 S.W.3d at 438-39. We presume that the Legislature chooses a statute's language with care, purposefully choosing each word it includes, while purposefully omitting words not chosen*. Id.* The meaning of a statute's language

6

may be informed by factors that include the law's objective.  TEX. GOV'T CODE ANN. § 311.023(1) (West 2005); *Shumake*, 199 S.W.3d at 284.

Analysis

**Closure of IWU and Phase I Unit and Sufficiency of Groundwater Monitoring**

Through their first and third issues, TJFA and NNC challenge the Commission's findings and conclusions regarding Waste Management's monitoring of groundwater under the landfill.

The permitted area of the existing ACL includes the IWU, the Phase I Unit, and the East Hill and West Hill disposal areas.  As the Commission's final order describes it, the permitted area is in the shape of a rectangle on the east with the proposed expansion on the west boundary of the rectangle.  The East Hill and West Hill disposal areas, respectively, occupy the east and west ends of the landfill.  Bisecting the two disposal areas is a drainage way flowing across the site from its northern permit boundary to its southern boundary.  Between the two disposal areas is the central area of the rectangle.  The north-south drainage way is situated on its western side.  The IWU is located in the northern part of the central area and the Phase I Unit is located on the southern side of the central area.  Another drainage way bisects the IWU and Phase I Unit, flowing from the west side of the East Hill westward until it intersects the north-south drainage way.

Only the West Hill disposal area is receiving waste.  The East Hill disposal area has been filled to final grade and final cover has been installed.  No disposal operations are being conducted in the IWU or the Phase I Unit.  The proposed expansion area is

7

located north-northwest of the West Hill.  The amendment does not authorize expansion or additional waste disposal operations for the eastern portion of the West Hill, the East Hill, the IWU, or the Phase I Unit.

The contentions TJFA and NNC present in support of their first and third issues focus not on monitoring of groundwater underneath the proposed expansion area of the West Hill, but on the IWU and the Phase I Unit.

The IWU is a 10.36-acre unit within the ACL permit boundary adjacent to and southwest of the East Hill area.  In 1971, the owner of the ACL began disposing of industrial waste in the IWU.  Permitted disposal of industrial waste in the IWU ended in 1972 when the Texas Water Quality Board issued an order revoking authority to dispose of industrial waste at the site.

The Phase I Unit, lying adjacent to and immediately south of the IWU, was first permitted for disposition of municipal solid waste in 1970.  Disposal of both municipal and industrial wastes occurred on the Phase I Unit.  Closure operations were conducted in about 1979.

In summary, TJFA and NNC contend that the groundwater monitoring system approved by the Commission's final order "is not capable of monitoring the potential migration of contaminants because the system ignores Phase I and the IWU on the mistaken premise that those areas are closed."

In response, Waste Management contends the Commission's final order contains no finding or conclusion that either the IWU or the Phase I Unit has been closed.  We agree with Waste Management.  The Commission determined those two units of the

8

ACL are subject to the regulations applicable to "pre-Subtitle D landfill units," that is, units that did not receive waste after October 9, 1991.[2]

Substantial evidence supports the Commission's findings that the IWU and the Phase I Unit "stopped receiving waste prior to October 9, 1991," and appellants do not contend otherwise.

In 1972 the Texas Water Quality Board required final closure of the IWU. Closure requirements of the Texas Water Quality Board including excavation of stained soil, construction of a clay cutoff wall, and construction of a clay cap, were implemented in February 1973. In April 1981 correspondence, the Texas Department of Water Resources stated, "The closed industrial portion of the site, inactive since 1972 remains subject to this Department's enforcement authority." Findings of fact and conclusions of law issued in July 1981 by the Texas Department of Health in conjunction with the application for permit number 249A included findings that:

> Although much was made of the operation of the old industrial waste site on what is now the area permitted under Permit No. 249, the use of the portion of 249 and the land in 249-A will not result in disturbance of such industrial waste as is present on 249.

---

[2] "'Subtitle D' refers to EPA-promulgated regulations providing minimum federal criteria with which all solid-waste landfills must comply." *Waste Mgmt. of Tex. v. Tex. Disposal Sys. Landfill, Inc.,* No. 03-10-00826-CV, 2012 Tex. App. LEXIS 4005, at 16 n.4 (Tex. App.—Austin May 18, 2012, pet. granted) (mem. op.) (citing 40 C.F.R. §§ 258.1-258.75 (2011)). According to the testimony of TJFA witness Rex H. Hunt, P.E., "The regulatory requirements established by the federal Subtitle D regulations are really the backbone of all regulations of MSW landfill facilities today." *See* 40 C.F.R. § 258.1(c) (providing minimum national criteria established under the Resource Conservation and Recovery Act for MSW landfill units do not apply to municipal solid waste landfill units that did not receive waste after October 9, 1991).

9

The areas of 249 which contain such industrial waste were identified and there is no additional waste to be deposited in those areas.

Robert H. Kier, Ph.D., P.G., testifying for TJFA, described the IWU as "graded smooth and vegetated" by 1984, but added that soil placement or displacement activity occurred in the late 1980s and mid-1990s. Based on his comments to aerial photographs of the ACL, soil may have been stockpiled on the IWU. A July 2000 report entitled "Human Risk Evaluation Report Closed Industrial Waste Unit" characterized the landfill cap as "an effective physical control . . . preventing offsite migration of waste contaminants from the IWU."

Dr. Kier testified that waste disposal in the Phase I Unit occurred "through at least 1981 and possibly into 1984." In an analysis of aerial photographs of the ACL, Dr. Kier did not note any waste disposal operations in the Phase I Unit after 1979. The record indicates the Phase I Unit "received waste from about 1971 through 1979." In two drawings predating October 9, 1991, Phase I is depicted as "complete" or "completed." A June 1997 "landfill gas collection and control system design plan" states, "[t]he 11.5 acre Phase I area at the south edge of the site has final cover soil in place and is not planned for further landfill use." A subsurface evaluation report for the Phase I Unit prepared in March of 1996 indicates the presence of a compacted clay cap. A geologic cross-section prepared as part of the application also shows a clay cap over this area.

Based on its findings the IWU and the Phase I Unit stopped receiving waste before October 9, 1991, the Commission concluded both units are subject to section

10

330.5(c) of its municipal solid waste ("MSW") regulations.[3] 30 TEX. ADMIN. CODE § 330.5(c) provides, in pertinent part:

> For MSW landfills that stopped receiving waste before October 9, 1991, . . . the closure provisions of § 330.453 of this title . . . apply. If not previously submitted, owners or operators shall submit a closure report that documents that MSW landfill units or unauthorized MSW sites, or portions thereof, have received final cover.

Implicit in the position taken by TJFA and NNC is an assertion a landfill unit cannot be subject to § 330.5(c) in the absence of a closure report that documents it has received final cover. TJFA and NNC argue no evidence shows that such a report was ever submitted for the IWU or Phase I.

We agree with Waste Management's contention that the absence of a closure report (if indeed no such report of "final cover" has been submitted for the IWU and the Phase I Unit), does not have the effect of disqualifying a landfill unit for treatment under § 330.5(c). The plain language of § 330.5(c) does not say as much. And comparison of the language of § 330.5(c) with that of its following subsection, § 330.5(d), is instructive. Subsection 330.5(d) applies to MSW landfill units that received waste after October 9, 1991, but stopped receiving waste before October 9, 1993. The subsection requires

---

[3] The Commission's findings include findings 46 and 48, reading:

46. The IWU stopped accepting waste prior to October 9, 1991; therefore, the only regulatory requirements that apply to the IWU are the limited closure and post-closure care provisions of 30 TEX. ADMIN. CODE ANN. §§ 330.5, 330.453, and 330.463.

48. The Phase I Unit area stopped accepting waste prior to October 9, 1991; therefore, the only regulatory requirements that apply to the Phase I Unit area are the limited closure and post-closure care provisions of 30 TEX. ADMIN. CODE ANN. §§ 330.5, 330.453, and 330.463.

that "final cover" of the landfill be "installed and certified" pursuant to the applicable regulatory requirements, and concludes with the provision that owners or operators of MSW landfill units "that fail to complete cover installation and certification within the time limits . . . will be subject to all the requirements of these regulations." 30 TEX. ADMIN. CODE § 330.5(d).[4] That such a provision is missing from § 330.5(c) strongly suggests that evidence of submission of a closure report is not the *sine qua non* for classification of the IWU and Phase I under § 330.5(c).

Neither Waste Management nor the Commission contend on appeal the Commission's final order determined that the IWU and the Phase I Unit are closed, and we agree its findings those units are subject to § 330.5(c) are not the equivalent of determinations they are closed.[5] To the contrary, Waste Management's brief points out Permit 249D specifically provides that "[c]losure of *the facility* shall commence . . . [u]pon completion of the disposal operations and *the site is completely filled*."[6] Its brief continues, "The 'facility' and the 'site' include not only the IWU and Phase I Unit, but

---

[4] Subsection 330.5(e) addresses MSW landfill units that receive waste on or after October 9, 1993, requiring that such units "must comply with all requirements of these regulations, unless otherwise specified." 30 TEX. ADMIN. CODE § 330.5(e).

[5] Waste Management's brief on appeal states ". . . TCEQ made *no* findings or conclusions regarding whether the IWU and Phase I Unit have been closed per current or former regulatory requirements. . . . Rather, in its final order, TCEQ found and concluded *only* that the IWU and Phase I Unit stopped receiving waste prior to October 9, 1991, and that, therefore, the only regulatory requirements that apply to the IWU and the Phase I Unit are the limited closure and post-closure care provisions of §§ 330.5, 330.453 and 330.463." (italics in original).

[6] Italics in original. Internal citation omitted.

also the entirety of the expanded [ACL] Facility, which is not yet 'completely filled.'[7] Accordingly, TCEQ did not absolve [Waste Management] of its closure obligations with respect to the IWU or the Phase I Unit, and did not opine on whether those closure obligations have been satisfied."

Nor can we agree with TJFA and NNC that Permit 249D ignores groundwater monitoring under the IWU and the Phase I Unit. The permit requires a total of ten monitoring wells in the central part of the ACL, where the IWU and the Phase I Unit are located, six of them new wells. Two of the six new wells, the Commission found, will monitor the IWU and a third will monitor the Phase I Unit. By their third issue, TJFA and NNC contend those findings are not supported by substantial evidence. We disagree.

Waste Management's expert geologist Jay Winters testified he designed the groundwater monitoring system incorporated in the permit application. He testified monitoring wells are located so as to encounter groundwater passing the "point of compliance," which he later described as a vertical plane extending down through the uppermost groundwater aquifer.[8] He elsewhere agreed that the point of compliance

---

[7] Internal citation omitted. The citation includes, however, references to the Commission's definitions of "facility" and "site." *See* 30 TEX. ADMIN. CODE § 330.3(52),(139).

[8] The Commission's regulations define point of compliance as "[a] vertical surface located no more than 500 feet from the hydraulically downgradient limit of the waste management unit boundary, extending down through the uppermost aquifer underlying the regulated units, and located on land owned by the owner of the facility." 30 TEX. ADMIN. CODE § 330.3(106). They also require the "point of compliance monitoring system" to "include monitoring wells installed to allow determination of the quality of groundwater passing the point of compliance . . . and to ensure the detection of groundwater contamination in the uppermost aquifer." 30 TEX. ADMIN. CODE § 330.403(a)(2).

encompasses locations at which "groundwater would be expected to be leaving the site."[9]

Winters testified the groundwater monitoring system was designed to ensure detection of groundwater contamination in the uppermost aquifer beneath the ACL facility. He was questioned closely at the contested case hearing about the capability of monitoring wells in the central area between the East and West Hills to monitor groundwater leaving the IWU and Phase I. Questioned about the absence of a monitoring well along a 2000-foot span[10] of the permit boundary south of Phase I, between the well identified as MW-11 and well MW-51, Winters pointed out the area was generally upgradient from the landfill and thus would not constitute a part of the point of compliance.

Monitoring well MW-11 sits on the west side of the north-south drainage way running along the west side of the central area of the ACL. Questioned about his opinion well MW-11 could be expected to detect contaminants in groundwater leaving the IWU, Winters explained that groundwater moves under the site very slowly, with the result that its movement is characterized by dispersed subsurface plumes rather than narrow channels. Responding to a question raising the possibility that contaminants moving along the path of the drainage way would bypass MW-11, Winters testified that

---

[9] TJFA expert Kier opined point of compliance "effectively means a set of ground water monitoring wells located down hydraulic gradient, that is in the direction of ground water flow, from one or more waste management units, the purpose of which is to detect contamination emanating from the waste management unit(s) before it can cross the facility boundary."

[10] Winters said TCEQ groundwater monitoring regulations call for a distance of no more than 600 feet between wells along the point of compliance. *See* 30 TEX. ADMIN. CODE § 330.403(a)(2) (so stating).

14

"under slow groundwater velocity conditions diffusion and dispersion will make a plume wider." He noted groundwater flow paths are depicted on exhibits as lines with arrows, but such "schematic flow paths . . . don't represent what a plume would do in the subsurface. The plumes would get wider as they move further along, which . . . would facilitate detection of these plumes." He concluded it was "highly unlikely" that contaminants from the IWU would escape detection by MW-11 merely because it is located on the west side of the drainage way.

TJFA witness Kier disagreed with Winters's opinion that the system he designed would monitor groundwater from the entire ACL facility, and with others of his opinions. He expressed the further opinion that the IWU and Phase I had effectively been excluded from monitoring as "separate units." He did, however, express agreement that the Phase I area is downgradient of the closed Travis County landfill. He also acknowledged his deposition testimony to the effect that MW-11 would be capable of monitoring the IWU, and indicated that MW-11 "could possibly be said to monitor Phase I." He made clear his opinion, however, that MW-11 was inadequate for that purpose.

In the administrative hearing, the question for determination was whether the application of Waste Management for permit number 249D "complie[d] with all applicable statutory and regulatory requirements." TEX. WATER CODE ANN. § 5.557(a) (West 2008); 30 TEX. ADMIN. CODE § 55.210(b). Our review presumes that substantial evidence supports the Commission's findings. *See City of El Paso v. Pub. Util. Com'n of Tex.,* 883 S.W.2d 179, 185 (Tex. 1994). Here, TJFA and NNC have not overcome this heavy burden. *See Charter Med.,* 665 S.W.2d at 452 ("the evidence in the record

15

actually may preponderate against the decision of the agency and nonetheless amount to substantial evidence"). The first and third issues of TJFA and NNC are overruled.

**Commission Action in Connection with Administrative Law Judge**

As noted, by its October 2009 interim order, the Commission remanded the application to the ALJ with instructions. TJFA and NNC challenge provisions of the interim order through their second issue. Travis County's challenge to the remand order is the subject of its third issue.

*Incorporation of Agreed Monitor Wells*

During 2002, Waste Management agreed with the City of Austin to place four additional groundwater monitoring wells in the vicinity of the IWU. This voluntary monitoring was not required by its TCEQ permit. In his original PFD, the ALJ proposed that these four wells be incorporated into the groundwater monitoring system covered by permit 249D. The ALJ's proposed findings of fact and conclusions of law recognized the voluntary monitoring agreement and required reconfiguration of the point of compliance to include the four wells "to mitigate the potential threat to human health and the environment should contaminants from the IWU and/or the Phase I Unit migrate towards the boundaries of the Facility."

In its remand order, the Commission instructed the ALJ to modify his proposed findings of fact and conclusions of law by, among other things, deleting:

> [T]he addition of the four wells specified by the private agreement between the City of Austin and [Waste Management] to the permit's groundwater monitoring system and reconfiguration of the Point of Compliance to include those wells in proposed Findings of Fact Nos. 125 and 127,

16

Conclusion of Law Nos. 28, 48, and 50 and Ordering Provision No. 1. The Commission's decision to delete the ALJ's recommendation is based on the fact that the IWU and Phase I Unit stopped receiving waste prior to October 9, 1991 and thus, the groundwater monitoring requirements in Subchapter J of the Commission's rules are inapplicable to those units pursuant to 30 TAC § 330.5(c).

An agency has limited authority to change a finding of fact or conclusion of law made by an ALJ or to vacate or modify an order of an ALJ. TEX. GOV'T CODE ANN. § 2001.058(e) (West 2008). The agency may exercise this authority if it concludes the ALJ did not properly apply or interpret applicable law or agency rules. TEX. GOV'T CODE ANN. § 2001.058(e)(1). The Commission may overturn an underlying finding of fact that serves as the basis for a decision in a contested case only if it determines the finding was not supported by the great weight of the evidence. TEX. HEALTH & SAFETY CODE ANN. § 361.0832(c) (West 2010). A conclusion of law may be overturned in a contested case only if it was clearly erroneous in light of precedent and applicable rules. TEX. HEALTH & SAFETY CODE ANN. § 361.0832(d). The agency must state in writing the specific reason and legal basis for a change made under subsection (e). TEX. GOV'T CODE ANN. § 2001.058. Finally, Government Code § 2003.047(m) provides in part:

> The commission may amend the proposal for decision, including any finding of fact, but any such amendment thereto and order shall be based solely on the record made before the administrative law judge. Any such amendment by the commission shall be accompanied by an explanation of the basis of the amendment.

TEX. GOV'T CODE ANN. § 2003.047(m) (West 2008).

The district court found the Commission erred by requiring the ALJ to delete the noted findings and conclusions, but found the error harmless. TJFA and NNC contend the Commission's error was harmful because it resulted in the approval of a monitoring

17

system inadequate to monitor groundwater from the IWU and Phase I. "We review the agency decision for reversible error; harmless error does not merit reversal. TEX. R. APP. P. 44.1 . . . . A showing of injury to the claimant is necessary before reversal is the appropriate remedy. Tex. Gov't Code Ann. § 2001.174(2) ("a court . . . shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced") . . . ." *Nobles v. Employees Ret. Sys. of Texas,* 53 S.W.3d 483, 489-490 (Tex. App.—Austin 2001, no pet.) (case citations omitted).

The Commission found that the monitoring system was adequate, and, with respect to its monitoring of the IWU and Phase I, in our disposition of their third issue, we have found substantial evidence supports such a finding. TJFA and NNC do not show additional harm to their substantial rights from any procedural error the Commission committed in its remand directions to the ALJ on the groundwater monitoring issue. We find any error of the Commission in requiring the ALJ to delete the noted findings and conclusions was harmless. TEX. R. APP. P. 44.1(a); *Chalifoux v. Tex. State Bd. of Med. Examiners,* No. 03-05-00320-CV, 2006 Tex. App. LEXIS 9598, at *50 (Tex. App.—Austin Nov. 1, 2006, pet. denied) (op. on reh'g, mem. op.).

*Hours of Landfill Operation*

Travis County challenges, through its third appellate issue, the Commission's remand of the issue concerning operating hours of the facility. After considering the PFD, oral argument of the parties, and the filings, the Commission remanded the case to the ALJ for the purpose of reopening the record to take additional evidence on

18

operating hours. The order instructed that the "ALJ should allow all parties to present evidence on the appropriateness of the proposed operating hours."

Section 2003.047(m) of the Government Code provides that, on consideration of a judge's proposal for decision, the Commission may "refer the matter back to the administrative law judge to reconsider any findings and conclusions set forth in the proposal for decision or take additional evidence or to make additional findings of fact or conclusions of law." TEX. GOV'T CODE ANN. § 2003.047(m) (West 2008). Additionally, the Commission's rules provide that the Commission "on the motion of any party or on its own motion, may order the judge to reopen the record for further proceedings on specific issues in dispute." 30 TEX. ADMIN. CODE § 80.265.

Travis County complains that by remanding this issue, TCEQ provided Waste Management a second bite at the apple to present evidence it failed to present in its original case. It urges the Commission's remand was arbitrary and capricious. Waste Management responds that remand was appropriate because its application did not propose a change in the landfill's existing hours of operation and there was confusion as to whether it was required to produce evidence supporting its existing operating hours. Travis County argues there was no such confusion.

Neither Government Code § 2003.047(m) nor the Commission's regulation requires confusion in the hearing record as a prerequisite for remand to the ALJ or for reopening the record for further proceedings, and we will not infer such a requirement. We see no error in the Commission's remand on the issue of operating hours.

19

The second issue of TJFA and NNC and the third issue of Travis County are overruled.

**Land Use Compatibility**

In its opinion in *N.E. Neighbors Coalition v. Tex. Comm'n on Envtl. Quality,* No. 03-11-00277-CV, 2013 Tex. App. LEXIS 4064, at \*22-28 (Tex. App.—Austin March 28, 2013, pet. denied) (mem. op.), the Austin Court of Appeals outlined statutory and regulatory provisions regarding land use compatibility determinations. That case dealt with a permit amendment granted by TCEQ to BFI Waste Systems of North America, L.L.C., owner of the Sunset Farms Landfill located immediately north of the ACL. *Id.* at \*1.

The Commission accepted the ALJ's findings that the existing ACL facility is compatible with surrounding land uses and that the proposed expansion of the ACL also is compatible. By its fifth issue, Travis County presents a substantial evidence challenge to those findings.

John Worrall prepared the land-use analysis for Waste Management and testified as its land-use expert, as he had for BFI in *N.E. Neighbors Coalition. Id.* at \*38. Here, Travis County initially contends that Worrall's land use study was so flawed the Commission should not have accepted it. In its argument supporting that contention, Travis County points to what it considers to be defective conclusions in Worrall's analysis. It first argues Worrall incorrectly assumed that Waste Management would comply with the law in its operation of the landfill and he failed to research and consider the landfill's compliance history. Travis County also argues Worrall focused on

20

historical land use and gave insufficient attention to current and future uses of land in the area. Third, the County argues Worrall incorrectly assumed that the growth occurring in the area surrounding the landfill was an indicator of its compatibility with other land uses. Fourth, the County asserts he incorrectly stated the landfill is consistent with municipal and regional growth policies, and fifth, that Worrall failed to consider the presence and impact of the IWU on human health and the environment. The County's assertion of weaknesses and defects in Worrall's study provides no basis for our exclusion of his report and testimony from our substantial evidence review.

As would be expected, the Commission's findings regarding land uses within one mile of ACL are similar to those the Austin court cited in *N.E. Neighbors Coalition*. *Id.* at *43-44. The findings state, and evidence shows, the predominant land use, 67.5%, within that distance of the ACL boundary is "open," including agricultural and vacant property and rights-of-way. Industrial uses, including the two active landfills Sunset Farms and ACL, occupy 15.9%. Ten percent of the land is residential, with the remaining 6.6% occupied by commercial, recreational, water and institutional uses. In 1985, the City of Austin annexed a 200-foot-wide strip along Giles Road in the far eastern part of the ACL, and the strip now is zoned DR – Development Reserve, and P-CO – Public with Conditional Overlay, by the city. No other part of the ACL facility is within the city limits of any incorporated city, nor does any other zoning ordinance or designation apply to it. The ACL and adjacent property are located within the City of Austin's Desired Development Zone, an area designated for future growth and development. Solid waste disposal has been a historically and geographically significant land use within a mile of the ACL since at least 1968. As of July 2008, there

21

were about 1,477 residences located within one mile of the ACL boundary. A majority of the residences are single family units, most concentrated in the Harris Branch Subdivision to the northeast, the Pioneer Crossing Subdivision to the northwest, and the Springdale Road/US 290 area subdivisions to the southwest. The nearest existing residence then was about 305 feet southwest of the permit boundary in the Colonial Place Subdivision. Almost 90% of the residences within a mile of the ACL boundary have been built while the ACL and other landfills have been operating. The proposed expansion of ACL would place landfill operations closer to the homes in the Pioneer Crossing Subdivision. The area within one mile of the ACL boundary includes about 57 businesses, including the Sunset Farms landfill, one school, 4,850 feet northwest of the boundary, and one daycare center about 3,440 feet from the boundary. The City of Austin has annexed properties to the northeast of the ACL, including the Harris Branch Subdivision. The ACL is located within the sector of the City of Austin that grew fastest from 1990 to 2000. All of these findings are probative of the compatibility of the ACL with surrounding land uses. The Commission also accepted the ALJ's finding that the ACL has not deterred growth in the vicinity of the landfill.

Travis County cites the population growth since the landfill's initial permitting in 1970, when the area around ACL was rural and sparsely developed, containing only 170 residences within a mile. From 2000 through 2008, its evidence shows the area within a five-mile radius of ACL added 7,835 new households, nearly 9% of all households formed within Travis County during that period. Developers have planned nearly 18,000 lots for additional single family housing, and nearly 8,800 additional multi-family housing units in the landfill area. Worrall estimated almost 10,000 new

22

households will be added to the area by 2017. Travis County's expert Jon White and the City of Austin's expert Greg Guernsey expressed strong disagreement with Worrall's conclusions supporting compatibility, and opined continued operation of the facility is incompatible with both existing and future land use in the area.

Travis County also cites evidence of hundreds of complaints filed with the TCEQ "concerning landfill operations in this area," and hundreds more filed with Travis County and the City of Austin. Evidence of complaints of odors, including odors requiring that children in the elementary school and the daycare center be kept inside, was presented. Four individuals testified to odors they encountered in the vicinity of the landfill. One said the odors were at a peak in the summers of 2007 and 2008, and another reported an "overpowering stench that smells of rotting garbage." All four testified to their perceptions the odors came from the ACL rather than from BFI's Sunset Farms facility, based on the direction of the wind. The witnesses also testified to problems with windblown trash and plastic bags, buzzards and other birds attracted to the landfill, dust and the loud noises of garbage trucks. One testified to his concern that expansion of the landfill would increase such problems.

Testimony also referred to a generally adverse relationship between Waste Management and area residents, dating back at least to 1990 when an agreed order was entered. As Travis County characterizes it, the overwhelming weight of the evidence showed incompatibility between the ACL and "existing and future" surrounding land use.

23

Despite the landfill's negative impact on land development that some witnesses identified, there was testimony that land development in the area could be anticipated even if the landfill were not closed. Matthew Udenenwu, the Commission executive director's witness, testified the application's odor management and windblown waste plans complied with the Commission's rules.

Noting that neither the Solid Waste Disposal Act nor the Commission's regulations define compatibility or provide a specific standard for its determination, 2013 Tex. App. LEXIS 4064 at *26, the court in *N.E. Neighbors Coalition* described the determination as one requiring TCEQ to "account for or balance all compatibility factors in its overall determination of whether the landfill adversely affects human health or the environment or is otherwise incompatible." *Id.* at *37. As did the Austin court in the face of a similar challenge to the compatibility of the neighboring Sunset Farms facility, we find Travis County has not overcome the presumption that the Commission's conclusion as to land-use compatibility is supported by substantial evidence. *Charter Medical,* 665 S.W.2d at 453. We overrule Travis County's fifth issue.

**Landfill Gas Monitoring System**

By their fourth issue, TJFA and NNC argue Waste Management's landfill gas management plan is inadequate because it allows a gap of some 3,000 feet between gas probes P-9 and P-10 along the southern perimeter of the ACL. This is chiefly an area bounded inside the ACL by the Phase I unit and immediately outside the ACL by the closed Travis County Landfill. The record describes the wastes disposed of in Phase I and those in the closed Travis County facility as "indistinguishable." The

24

southern perimeter of the ACL at this location traverses the interface between these areas.

The pertinent TCEQ regulation, 30 TEX. ADMIN. CODE § 330.371, provides:

(a) Owners or operators of all landfill units shall ensure that:

    (1) the concentration of methane gas generated by the facility does not exceed 1.25% by volume in facility structures (excluding gas control or recovery system components); and

    (2) the concentration of methane gas does not exceed 5% by volume in monitoring points, probes, subsurface soils, or other matrices at the facility boundary defined by the legal description in the permit or permit by rule.

(b) Owners or operators of all landfill units shall implement a routine methane monitoring program to ensure that the standards of subsection (a) of this section are met.

    (1) The type and frequency of monitoring shall be determined based on the following factors:

        (A) soil conditions;

        (B) the hydrogeologic conditions surrounding the facility;

        (C) the hydraulic conditions surrounding the facility;

        (D) the location of facility structures and property boundaries; and

        (E) the location of any utility lines or pipelines that cross the MSW landfill facility.

    (2) The minimum frequency of monitoring shall be quarterly.

30 TEX. ADMIN. CODE § 330.371.

As the Commission's briefing points out, its regulation requires landfill operators to ensure methane gas concentration does not exceed 5% by volume in monitoring

points, probes, subsurface soils, or other matrices at the facility boundary,[11] but does not prescribe a minimum interval between gas probes like that applicable to groundwater monitoring wells along the point of compliance. The Commission also notes the stretch between probes P-9 and P-10 is part of the existing landfill gas monitoring of the southern perimeter, authorized by the Commission in 2006.

Charles Dominguez, P.E., the engineer who prepared Waste Management's permit application, addressed the gap between the probes in his testimony. Referring to language in the application, he said the absence of probes between P-9 and P-10 is due to a "decrease in topography" west of the area containing P-10 and geologic conditions which provide a "preferential flow path" for gas which "daylights in the topographic low." Similarly, his testimony referred to another topographical feature located south of the permit boundary along the west side of the closed Travis County Landfill "providing a natural vent to atmosphere for any gas that may migrate southward from the Austin Community Landfill." Dominguez further testified that because of contiguous waste at the boundary separating ACL and Travis County Landfill it was not possible for a probe inserted into this waste to "serve its intended purpose."

The Commission accepted the ALJ's findings adopting Dominguez's explanation of the gap. TJFA and NNC describe the Commission's findings as improper "exceptions" to the regulatory requirement that operators ensure that gas concentrations at "other matrices at the facility boundary" do not exceed the maximum level. But as noted, the regulation does not require installation of probes spaced at specific intervals along the facility boundary, and we agree with the Commission that the 3000-foot gap

---

[11] 30 TEX. ADMIN. CODE § 330.371(a)(2).

under examination, reasonably explained by testimony, does not demonstrate the Commission disregarded its regulation by finding the landfill gas management plan adequate.

We find substantial evidence supports the Commission's findings leading to the conclusion of regulatory compliance. The fourth issue of TJFA and NNC is overruled.

**Sufficiency of Ponded Water Prevention Plan**

In their fifth issue, TJFA and NNC contend the Commission erred by concluding Waste Management's ponded water prevention plan is sufficient because, they further contend, a water pond, identified as the "south pond," is constructed over waste, contrary to Commission rules. Of concern to TJFA and NNC is the prospect of ponded water contacting waste and then draining off the facility undetected.

Commission rule 330.167, entitled "ponded water," provides:

> The ponding of water over waste on a landfill, regardless of its origin, must be prevented. Ponded water that occurs in the active portion of a landfill or on a closed landfill must be eliminated and the area in which the ponding occurred must be filled in and regraded within seven days of the occurrence. A ponding prevention plan must be provided in the site operating plan that identifies techniques to be used at the landfill to prevent the ponding of water over waste, an inspection schedule to identify potential ponding sites, corrective actions to remove ponded water, and general instructions to manage water that has been in contact with waste.

30 TEX. ADMIN. CODE § 330.167.

The record indicates the central channel south pond is an engineered drainage feature, the alteration of which the Commission approved through a December 9, 2003 modification of permit 249C.

27

The testimony presented conflicting evidence as to whether solid waste underlies the south pond. TJFA and NNC rely on testimony regarding the bore hole log from a groundwater monitoring well, and testimony from a Waste Management witness indicating that the log shows waste mixed with clay. Waste Management and TCEQ contend maps show a bore hole for a piezometer is more directly under the pond location. It is undisputed no waste was encountered in the boring for the piezometer. Waste Management and the Commission further rely on the testimony of Matthew Udenenwu, the Commission executive director's witness, who said the south pond was not, to his knowledge, over waste. He said he had reviewed cross-sections of the ponds, and saw no waste.

Assuming for this discussion the Commission's task required resolution of this conflicting testimony,[12] it was the sole judge of the weight to be given to a witness's testimony. *Pioneer Natural Res. USA, Inc. v. PUC,* 303 S.W.3d 363, 367 (Tex. App.—Austin 2009, no pet.). And it was entitled to "accept or reject in whole or in part the testimony of the various witnesses who testif[ied]." *Id.* The Commission's fact-finding and its ultimate determination relevant to the question this issue poses was supported by substantial evidence and was not arbitrary or capricious. The fifth issue of TJFA and NNC is overruled.

---

[12] Waste Management suggests that § 330.167 has no application to a concrete engineered pond like the south pond. It points to the rule's language requiring filling and regrading. We do not reach that contention.

28

**Adequacy of "Piggyback" Liner System**

In their sixth issue, TJFA and NNC argue it was error for TCEQ to rely on Waste Management's settlement analysis as the basis for approving the piggyback liner system.

As noted, the proposed expansion of ACL was lateral, not vertical, but some overlap of new waste over existing waste will occur at the point at which the new lateral expansion merges with the existing West Hill disposal area. Waste Management's application specified a vertical expansion of the existing site at that point. Waste Management proposed a "piggyback" liner over the existing solid waste where the newly-disposed waste will overlay the existing waste. Engineer Dominguez explained that:

> [I]f an existing landfill is to be expanded vertically, and if the vertical expansion will occur over an existing portion of the landfill that was constructed prior to any requirement to line the landfill, then a modern-day composite liner must be placed on top of the existing waste (i.e., over the existing waste and under the new waste that will be added as a result of the vertical expansion).

The dispute TJFA and NNC present here concerns Dominguez's calculations of the degree to which the landfill will settle. The landfill settlement calculation bears on the strain placed over time on the liner piggybacked over the existing waste. The ultimate concern of the analysis is the integrity of the composite liner.

Dominguez explained during testimony that waste filling at the piggyback area was "essentially complete" in 1996. Over the period 1998-2006 he therefore was able to watch "the landfill settle and using that to develop a model of what the settlement in the landfill would be." He selected fourteen points in the piggyback liner area and

vicinity to determine the occurrence of settlement and evaluate its consistency. His analysis considered annual elevation data at each of the fourteen points for the eight-year period 1999-2006. The analysis ignored areas where soil was "stockpiled" because it would skew a determination of settlement based on topography. Dominguez processed the relevant data through a compression index model that, according to a description in the record, "is believed to overestimate the settlement within medium-aged landfills, so is expected to produce a conservative estimate of the waste settlement." Dominguez concluded the estimated maximum settlement of the piggyback liner area during the period 2010-2057 is 5.3 feet at a location "with approximate[ly] 80 feet of existing waste." According to Dominguez, including the ignored data in the analysis would reduce the amount of settlement calculated.

The Commission accepted the ALJ's three findings detailing the waste settlement calculation, based on Dominguez's methodology, and accepted the ALJ's ultimate finding of fact that "[w]hile waste settlement will occur beneath the piggyback liner, the estimated maximum settlement of the liner will not compromise the integrity of the piggyback liner."

On appeal, TJFA and NNC complain of the methodology Dominguez employed. An expert's underlying technique or principle must be reliable. *E.I. duPont de Nemours & Co., Inc. v. Robinson,* 923 S.W.2d 549, 557 (Tex. 1995). We find the challenge to Dominguez's methodology without merit. TJFA and NNC use a broad brush to paint his settlement analysis with complaints. But chiefly their contentions concern his methodology of selecting data points for measurement and excluding certain elevation readings derived from these points. As noted, Dominguez explained his reasons for

30

excluding some of the annual elevation measurements.  Dominguez gave lengthy testimony and was subject to knowledgeable and vigorous cross-examination.  His analytical model was site-specific.  TJFA and NNC provided expert testimony criticizing Dominguez's methodology and conclusions but they did not present their own, site-specific, analysis demonstrating a contrary result.  We find Dominguez's opinion testimony and related documentary evidence concerning the settlement analysis constitutes substantial evidence supporting the Commission's findings.  The sixth issue of TJFA and NNC is overruled.

**Waste Management's Compliance History**

In its fourth issue, Travis County contends the Commission erred in finding that Waste Management's compliance history warranted the grant of the expansion permit. Travis County argues the Commission failed to consider the entire compliance history of Waste Management, including the hundreds of complaints filed with the Commission, Travis County and the City of Austin, as well as the significant fines Waste Management was ordered to pay in 2004. Waste Management argues its compliance history, including the violations set forth in the 2004 Agreed Enforcement Order and its corrective measures, was adequately considered.

Evaluation of compliance history under the Commission's rules begins with an accounting and scoring of various compliance events or "components" for the five years prior to the date a permit application is filed.  The regulations then employ a formula to calculate a numerical compliance history score. Based on that score, each site and entity regulated by the Commission is classified as either a "high," "average," or "poor"

performer. The record indicates the Commission applied these rules to Waste Management under the rating system in place at that time.[13] Both Waste Management and the ACL facility are classified as "average" performers.

We see no legal basis for denial of an application based on an "average" compliance history rating.[14] Waste Management was never rated in the lowest classification, which is necessary for denial of a permit based on compliance history. *See* TEX. HEALTH & SAFETY CODE ANN. § 361.089(f)(1) (West Supp. 2013). The record supports the Commission's finding as to Waste Management's compliance history, and we overrule Travis County's fourth issue.

**Conformance with the Regional Solid Waste Management Plan**

In Travis County's first issue, it asserts the Commission erred in finding Waste Management's application for expansion demonstrated conformance with the Capital Area Council of Government's Regional Solid Waste Management Plan. Travis County points out evidence at the hearing established the Council sent Waste Management two "letters of non-conformance."

Section 363.066 of the Texas Health & Safety Code entitled, Conformity with Regional or Local Solid Waste Management Plan, provides:

---

[13] The rating system now describes the classifications as "high," with fewer than 0.10 points, "satisfactory" with 0.10-55 points, and "unsatisfactory" with more than 55 points. 30 TEX. ADMIN. CODE § 60.2.

[14] Challenges to a classification must be made in a separate proceeding. *See* 30 TEX. ADMIN CODE § 60.3(g).

(a) On the adoption of a regional or local solid waste management plan by commission rule, public and private solid waste management activities and state regulatory activities must conform to that plan.

(b) The commission may grant a variance from the adopted plan under procedures and criteria adopted by the commission.

TEX. HEALTH & SAFETY CODE ANN. § 363.066 (West 2010).

The Commission's regulations also provide:

If a regional or local solid waste management plan is adopted by the commission, public and private solid waste management activities and state regulatory activities shall conform to the adopted regional or local solid waste management plan. The plan shall only remain in effect during the planning period defined in the plan. Under the procedures and criteria of subsections (g) and (h) of this section, the executive director may grant a variance from an adopted regional or local solid waste management plan.

30 TEX. ADMIN. CODE § 330.641(d).

The Capital Area Council's regional solid waste management plan was submitted to the Commission, which adopted it in 1992. A revised version was approved by the Commission in May 2007. As revised, the plan states goals, and more specific objectives subsidiary to each goal. The plan's Goals No. 7 and No. 15, with their objectives, read in part:

Goal #7 Ensure the proper management and disposal of municipal solid waste

*Objectives*

- Encourage best industry practices for all MSW facilities

- Encourage MSW facilities to be involved with surrounding communities

Goal #15   Use the Plan Conformance/Facility Application Review process and the provisions of § 363.066, Health & Safety Code, to address land use compatibility and other local issues in order to avoid if possible, or minimize if avoidance is not possible, adverse impacts from municipal solid waste (MSW) facilities on human health and the environment.

*Objectives:*

- Ensure that the use of a site for a MSW facility does not adversely impact human health or the environment by evaluating and determining impacts of the site upon counties, cities, communities, groups of property owners, or individuals in terms of compatibility of land use, zoning in the vicinity, community growth patterns, and other factors associated with the public interest.

- Ensure that MSW facilities' impacts on roads, drainage ways, and other infrastructure are assessed, that both existing and planned future land uses near the facility are considered, and the infrastructure problems created by the facility and the potential for land use conflicts between MSW facilities and existing and planned development are fully and adequately taken into account and addressed.

- Ensure that MSW facilities are good neighbors, by assessing and considering every applicant's five-year compliance history in Texas to the fullest extent allowed by TCEQ.

- Avoid if possible, or minimize if avoidance is not possible, nuisance conditions associated with MSW facilities that generate community concerns by ensuring that applicants implement reasonable and appropriate measures and best management practices to prevent and control litter, stormwater runoff, vectors, odor, excessive noise, light pollution and other nuisance conditions.

We agree with the Commission that neither the Solid Waste Disposal Act nor TCEQ regulations assign to the Capital Area Council the role of determining, in permitting proceedings, whether solid waste management activities and regulatory activities conform with its regional plan. Here, the same evidence that supports the Commission's findings with regard to the issues stated in the plan's goals also must be seen as supporting its finding that "[n]one of the specific bases for the [Council's] non-conformance determination are a sufficient basis to support a denial of [Waste Management's] Application" and its conclusion that "[s]olid waste management activities at [the ACL] conform with the applicable regional solid waste management plan . . . ." We overrule Travis County's first issue.

34

**Mislabeling of Phase I and IWU**

Travis County, in its second issue, and TJFA and NNC, by their seventh issue, complain that Waste Management, on many of its application exhibits, incorrectly and improperly mislabeled the Phase I Unit as a part of the closed Travis County Landfill. Travis County argues the mislabeling violated Waste Management's obligation under § 330.57(d) of the Commission's MSW permit regulations to provide complete, accurate and clear information in its application. TJFA and NNC assert the Commission erred by approving the application because of its false labeling. *See* 30 TEX. ADMIN. CODE § 330.57(d) (submission of false information constitutes grounds for denial of permit).

Appellants' complaints regarding the mislabeling on the exhibits were aired at the contested case hearing. The Commission's final order is clear that the ACL permit boundary includes the Phase I Unit. Appellants complain of potential consequences of the mislabeling harmful to their interests, but we find their complaints entirely speculative. We cannot agree that the mislabeling on exhibits led to any error in findings or conclusions. The second issue of Travis County and the seventh issue of TJFA and NNC are overruled

Conclusion

Having considered and overruled each issue on appeal, we affirm the district court's judgment affirming the Commission's order.

James T. Campbell
Justice

35