| Baker and Others (Lessors/Royalty Owners) | | Barnes (Lessor/Royalty Owner) |

BAKER LEASE BARNES LEASE

| Moose (Lessee) (Partial Assignment of Baker Lease working interest to Moose Assignees, including Tawes) | Working Interest Unit Agreement And Joint Operating Agreement (created pooled Baker Unit) | Dominion (Successor to original lessee) |

**Initial Well (David Baker No. 1)**
- Operator: Dominion
- Non-operators: Moose, Moose Assignees (including Tawes)
- All parties consent

**Additional, Non-Consent Wells (Baker-Barnes No. 1 and No. 2)**
- Operator: Moose
- Non-operators: Moose Assignees (including Tawes)
- Consenting: Moose, Moose Assignees (including Tawes)
- Non-Consenting: Dominion

Tawes acquires all Moose working interest at bankruptcy foreclosure sale

**TGS–NOPEC GEOPHYSICAL COMPANY d/b/a TGS–NOPEC Corporation, Petitioner,**

**v.**

**Susan COMBS, Successor–in–Interest to Carole Keeton Strayhorn, Comptroller of Public Accounts, and Greg Abbott,**

Attorney General of Texas, Respondents.

No. 08–1056.

Supreme Court of Texas.

Argued April 15, 2010.

Decided May 27, 2011.

James Thomas McBride, Jackson Walker LLP, Houston, for TGS-Nopec Geophysical Company.

William E. Storie, Office of the Attorney General of Texas–Taxation, Christine Monzingo, Office of the Attorney General of Texas, Kevin D. Van Oort, Asst. Atty. General Taxation Div., Attorney General Greg W. Abbott, Attorney General of Texas, Clarence Andrew Weber, Kelly Hart & Hallman LLP, David S. Morales, Office of the Attorney General of Texas, Austin, for Susan Combs.

Gerard A. Desrochers, Houston, for Amicus Curiae International Association of Geophysical Contractors.

Thomas R. Phillips, Renn G. Neilson, Baker Bots L.L.P., Austin, for Amicus Curiae Westerngeco LLC.

Justice MEDINA delivered the opinion of the Court.

This appeal arises from a franchise tax dispute involving the apportionment of receipts from the licensing of geophysical and seismic data to customers in Texas. The taxpayer complains that the Comptroller has mischaracterized these receipts as Texas business and thereby has erroneously increased its franchise tax burden. At issue is whether these receipts should be categorized as receipts from the use of a license or as receipts from the sale of an intangible asset. If the receipts are from the use of a license, then the Comptroller has correctly assessed the tax. If the receipts are from the sale of an intangible, then the Comptroller has erred in assessing additional taxes because receipts from the sales of intangibles are Texas receipts only if the legal domicile of the payor is Texas.

The lower courts concluded that the Comptroller had appropriately characterized the revenue as receipts from the use of a license in Texas and therefore correctly assessed the additional taxes. 268 S.W.3d 637 (Tex.App.-Austin 2008). We disagree and reverse and remand to the trial court for further proceedings.

## I. Background

The taxpayer is TGS–NOPEC Geophysical Company ("TGS"), a Delaware Corporation with its principal place of business in Houston, Texas. It gathers, interprets, and markets seismic and geophysical data regarding subsurface terrains worldwide with sophisticated seismic equipment and software technology. TGS collects and stores this data in a master library and licenses various parts of the library to customers who use the licensed data to evaluate oil and gas formations for drilling operations. TGS requires its customers to enter into a master license agreement, which governs the parties' rights and obligations. The master license agreement describes TGS's seismic data as proprietary information and as valuable and highly confidential trade secrets. The master license agreement also states that TGS retains title to the seismic data and that it only licenses the limited use of the information to its customers.

When a customer wants to access data for a particular location, TGS and the customer enter into a specific license agreement under the master license agreement. TGS generally charges its customers a flat fee to access data under these specific license agreements and does not receive any additional payments, such as royalties. TGS delivers the data to its customers in tangible media forms such as magnetic tapes, printed materials, or film. Each piece of data provided by TGS includes the following notice:

> These data are owned by and are trade secrets of [TGS]. The use of these data is restricted to companies holding a

valid use license from [TGS] and is subject to the strict confidentiality requirements of that license. The data may not be disclosed or transferred except as expressly authorized by the license. Unauthorized disclosure, use, reproduction, reprocessing or transfer of this data by or to a third party is strictly prohibited.

The licensing agreements are nonexclusive, and TGS may license the same data to multiple customers. Its customers receive unlimited access to the data under the specific license purchased, but they cannot disseminate the information to third parties, nor is the license transferrable.

The Comptroller audited TGS in 2004 for the 1997–2000 and 2001–2003 tax years and concluded that TGS owed additional franchise taxes, penalties, and interest. The audit deficiency arose from the Comptroller's determination that, for apportionment purposes, a significant amount of TGS's receipts should have been characterized as Texas receipts rather than non-Texas receipts. This caused a larger percentage of TGS's earned surplus and taxable capital to be subject to the franchise tax. The contested gross receipts are revenue that TGS received from licensing its seismic data to customers in Texas. TGS characterized these receipts as revenue from the sale of intangibles. TGS reported some of these receipts as coming from "other business done in the state," but the bulk of these receipts were reported as falling outside the category of business done in Texas. Receipts from the sale of intangibles are Texas receipts only if the payor is located in Texas. 34 TEX. ADMIN. CODE § 3.549(e)(30)(B). The payor's location is deemed to be its legal domicile.[1] 34 TEX. ADMIN. CODE § 3.549(b)(7).

■ For many years, the Comptroller characterized TGS's licensing of its geophysical information as the sale of an intangible and allocated the revenue TGS derived therefrom to the customer's legal domicile. *See* TEX. TAX CODE § 171.103(a)(6). The Comptroller's 2004 audit, however, characterized this revenue as receipts from the use of a license. This determination is significant because receipts from the use of a license are allocated to Texas if the license is used in Texas, whereas receipts from the sale of an intangible sold and used in Texas are not allocated to Texas, if the payor's domicile is elsewhere. TEX. TAX CODE § 171.103(a)(4); *see also* 34 TEX. ADMIN. CODE § 3.549(e)(30)(A)(iii) (providing that revenue an owner of a license receives is included in Texas receipts to the extent the license is used in Texas). The Comptroller's audit also concluded that most of TGS's licenses were used in Texas, which increased its Texas receipts and franchise taxes. After the audit, TGS owed $1,394,748.11 in additional franchise taxes and $333,741.60 in penalties and interest.

TGS paid the additional taxes, penalties, and interest under protest and timely filed this suit. *See* TEX. TAX CODE § 112.052(a) (requiring taxpayer to pay contested taxes as a predicate to filing suit). TGS and the Comptroller filed cross motions for summary judgment in the trial court, which granted both motions in part. The trial

---

1. The Texas Administrative Code provides:

The legal domicile of a corporation is its state of incorporation. The legal domicile of a partnership or trust is the principal place of business of the partnership or trust. The principal place of business of a partnership or trust is the location of its day-to-day operations. If the day-to-day operations of the partnership or trust are conducted equally or fairly evenly in more than one state, then the principal place of business is the commercial domicile.

34 TEX. ADMIN. CODE § 3.549(b)(6).

court granted the Comptroller's motion with regard to the assessment of the additional tax liability and TGS's motion with regard to penalties and interest, ordering the Comptroller to refund the assessed penalties and interest. The court of appeals affirmed the trial court's judgment, 268 S.W.3d 637 (Tex.App.-Austin 2008), and TGS appealed to this Court, complaining that it did not owe the additional franchise taxes assessed by the Comptroller and affirmed by the lower courts.

## II. Analysis

The dispute here is over how the receipts TGS generates from licensing its data should be allocated. TGS asserts that the revenue it earns as the owner and licensor of seismic data should be characterized as receipts derived from the sale of an intangible asset and, as such, allocated to the state of the payor's domicile. TEX. TAX CODE § 171.103(a)(6). The Comptroller, on the other hand, argues that this revenue is derived from the use of a license because TGS employs license agreements to complete its sales in Texas. Receipts from the use of a license are allocated to the state in which the license is used. *Id.* § 171.103(a)(4).

The court of appeals agreed with the Comptroller, holding that "[t]he gross receipts earned by TGS are derived from TGS' use of a license within the meaning of the statutes." 268 S.W.3d at 646. The court thus interpreted the statutory phrase "use of a license" to apply to the use of a license as a transfer mechanism. *See id.* at 645 (holding that "the payments received by TGS for licensing its customers to use proprietary seismic data are gross receipts from the use of a license"). The question then is whether the act of licensing an intangible asset is the "use of a license" within the meaning of the franchise tax statute. To answer that ques-

tion, we begin with the purpose and operation of the Texas franchise tax statute. *See* TEX. TAX CODE ch. 171.

### A. The Texas Franchise Tax

■ The franchise tax is a tax on the privilege of doing business in Texas. *Bullock v. National Bancshares Corp.,* 584 S.W.2d 268, 270 (Tex.1979), *cert. denied,* 444 U.S. 1016, 100 S.Ct. 667, 62 L.Ed.2d 645 (1980). It is imposed on each taxable entity that does business in this state or that is chartered or organized here. TEX. TAX CODE § 171.001(a); *see also id.* § 171.002 (defining taxable entity). Before 2008, the franchise tax was imposed on an entity's capital or earned surplus. *See* Act of May 30, 1997, 75th Leg., R. S., ch. 1185, §§ 5–6, 1997 Tex. Gen. Laws 4569, 4569–70. The tax code, however, presently imposes franchise tax on an entity's "taxable margin." TEX. TAX.CODE §§ 171.002, .101; *see* Act of May 2, 2006, 79th Leg., 3rd C.S., ch.1, § 2, 2006 Tex. Gen. Laws 1, 6 (amending TEX. TAX CODE § 171.002). Because all of a company's capital, earned surplus, or taxable margin may not be attributable to business done in Texas, receipts must be apportioned between Texas and other jurisdictions. The tax code does this by multiplying an entity's capital, earned surplus, or taxable margin (depending on the applicable version of the code) by a fraction, the numerator of which consists of receipts from business done in Texas (Texas-sourced receipts), and the denominator of which consists of all receipts from business anywhere, including Texas. TEX. TAX.CODE § 171.006.

In sourcing receipts to Texas, the tax code identifies business done in this state as the sum of the taxable entity's gross receipts from the following activities:

(1) each sale of tangible personal property if the property is delivered or

shipped to a buyer in this state regardless of the FOB point or another condition of the sale;

(2) each service performed in this state, except that receipts derived from servicing loans secured by real property are in this state if the real property is located in this state;

(3) each rental of property situated in this state;

(4) *the use of a patent, copyright, trademark, franchise, or license in this state;*

(5) each sale of real property located in this state, including royalties from oil, gas, or other mineral interests; and

(6) *other business done in this state.*

TEX. TAX CODE § 171.103(a)[2] (emphasis added) (hereafter referred to as the "sourcing statute"). The issue here is whether the revenue TGS earns licensing its seismic data library is appropriately sourced under subsection (4) as receipts from the "use of a license in this state," *id.* § 171.103(a)(4)[3] or under subsection (6) as "other business done in this state," *id.* § 171.103(a)(6).[4] If subsection (4) applies, the Comptroller has appropriately sourced the receipts. But if subsection (6) applies, as TGS maintains, the receipts must be sourced to the state of the customers' domicile under the "location of the payor" rule, and the Comptroller's assessment must be revised. *See* 34 Tex. Admin. Code § 3.549(e)(30)(B); *id.* § 3.557(e)(25)(B).

## B. Standard of Review

The Comptroller is charged with administering the provisions of the franchise tax. *See* TEX. GOV'T CODE § 403.011 (enumerating general powers of the Comptroller's office). The Legislature has given the Comptroller broad discretion to adopt rules for the collection of taxes and other revenues so long as such rules do not conflict with state or federal law. *See* TEX. TAX.CODE § 111.002(a).

If there is vagueness, ambiguity, or room for policy determinations in a statute or regulation, as there is here, we normally defer to the agency's interpretation unless it is plainly erroneous or inconsistent with the language of the statute, regulation, or rule. *See Pub. Util. Comm'n v. Gulf States Utils. Co.,* 809 S.W.2d 201, 207 (Tex.1991); *Stanford v. Butler,* 142 Tex. 692, 181 S.W.2d 269, 273 (1944). Here, the Comptroller is the administrative agency charged with enforcing the tax code, and her construction of the code is therefore entitled to serious consideration. *See Tarrant Appraisal Dist. v. Moore,* 845 S.W.2d 820, 823 (Tex. 1993).

Deference to the agency's interpretation, however, is not conclusive or unlimited. *See Rodriguez v. Serv. Lloyds Ins. Co.,* 997 S.W.2d 248, 254–55 (Tex. 1999). We defer only to the extent that the agency's interpretation is reasonable, and no deference is due where an agency's interpretation fails to follow the clear, unambiguous language of its own regulations. *See Pub. Util. Comm'n,* 809 S.W.2d at 207. We further interpret administrative rules, like statutes, under traditional principles of statutory construction. *Rodriguez v. Service Lloyds Ins. Co.,* 997 S.W.2d 248, 254 (Tex.1999).

---

**2.** Despite recent changes in the franchise tax laws, for convenience we cite to the current tax code sourcing provisions, which have not been affected by these changes. Although we cite to the current code, TGS taxes must, of course, be determined under the code in effect at the time the taxes were incurred.

**3.** Formerly TEX. TAX CODE §§ 171.103(4) & 171.1032(a)(4).

**4.** Formerly TEX TAX CODE § 171.103(5).

When construing a statute, our primary objective is to ascertain and give effect to the Legislature's intent. Tex. Gov't Code § 312.005; *see Texas Dept. of Protective and Regulatory Services v. Mega Child Care,* 145 S.W.3d 170, 176 (Tex.2004). To discern that intent, we begin with the statute's words. Tex. Gov't Code § 312.003; *see Texas Dept. of Transp. v. City of Sunset Valley,* 146 S.W.3d 637, 642 (Tex.2004). If a statute uses a term with a particular meaning or assigns a particular meaning to a term, we are bound by the statutory usage. *Texas Dep't of Transp. v. Needham,* 82 S.W.3d 314, 318 (Tex.2002). Undefined terms in a statute are typically given their ordinary meaning, but if a different or more precise definition is apparent from the term's use in the context of the statute, we apply that meaning. *In re Hall,* 286 S.W.3d 925, 928–29 (Tex.2009). And if a statute is unambiguous, we adopt the interpretation supported by its plain language unless such an interpretation would lead to absurd results. *Mega Child Care,* 145 S.W.3d at 177. We further consider statutes as a whole rather than their isolated provisions. *City of Sunset Valley,* 146 S.W.3d at 642. We presume that the Legislature chooses a statute's language with care, including each word chosen for a purpose, while purposefully omitting words not chosen. *In re M.N.,* 262 S.W.3d 799, 802 (Tex.2008). With these rules in mind, we turn to the sourcing statute, and the Comptroller's regulations which implement it.

### C. Sourcing Receipts from Intangible Assets

The history of the franchise tax indicates that the Comptroller has been allocating receipts from intangibles to the state of the payor's domicile since 1917. *Humble Oil & Refining Co. v. Calvert,* 414 S.W.2d 172, 180 (Tex.1967). This practice ended in 1959, in part, when the Legislature amended the sourcing statute to require use-based sourcing for two kinds of intangibles, patents and copyrights. *See* Act of August 6, 1959, 56th Leg., 3rd C.S., ch. 1, art. 12.02, 1959 Tex. Gen. Laws 187, 307 (sourcing "royalties from the use of patents or copyrights" to their place of use). Before this, the sourcing statute consisted of a single catch-all provision, for business done in the state, similar to subsection (6) of the current statute.[5] And under the earlier statute, the Comptroller sourced all receipts from intangibles under the "location of the payor" rule. *See Humble Oil & Refining Co.,* 414 S.W.2d at 180.

After the 1959 amendment, receipts from intangible assets, other than patents and copyrights, continued to be taxed as other business under the "location of the payor" rule until 1988, at which time the Comptroller began sourcing revenue from three additional intangible assets based on location of use. The Comptroller made this change by promulgating a new rule. Rule 3.403(e)(11) provided that "[r]eceipts to the owner for the use of trademarks, franchises, and licenses are allocated according to the location where used." 12 Tex. Reg. 2971 (1988) (to be codified at 34 Tex. Admin Code § 3.549). After Rule 3.403(e)(11)'s adoption, the Comptroller began sourcing receipts from licensing trademarks, franchises, and licenses according to their place of use, like patents and copyrights. Receipts from licensing other types of intangible assets, however, continued to be sourced to the location of the payor under the catch-all provision pertaining to "other business."

---

**5.** *See* former Tex.Rev.Civ. Stat. art. 7084, repealed by Act of August 6, 1959, 56th Leg., 3rd C.S., ch. 1, art. 12.02, 1959 Tex. Gen. Laws 187, 307.

Comptroller letter rulings from the period confirm this practice. Concerning the licensing of data, the Comptroller issued the following guidance in 1990:

> ... gross receipts from [licensing seismic data] are from a license to use the geophysical information. For franchise tax purposes, the gross receipts from the licensing of the use of the information would be considered receipts from the sale of an intangible and would be allocated to the legal domicile of the payor.

Comptroller Letter Ruling 9005L1019F09 (5/1/1990); *see also* Comptroller Letter Ruling 9103L1087B07 (3/1/1991) (issuing similar ruling to another licensor of seismic data). These rulings recognized that Rule 3.403(e)(11)[6] did not apply to the receipts because the customers used seismic data rather than the license conveying the data.

The Legislature did not amend the sourcing statute to match the Comptroller's sourcing rule on trademarks, franchises, and licenses until 1997. After this amendment, subsection (4) of the sourcing statute provided that "gross receipts of a corporation from its business done in this state [includes] the corporation's receipts from ... the use of a patent, copyright, trademark, franchise, or license in this state ..." Act of May 20, 1997, 75th Leg., R. S., ch. 1185, § 5, 1997 Tex. Gen. Laws 4569, 4570. The amendment equalized the tax treatment among similar intangible assets by adding licenses, trademarks, and franchises to the provision governing patents and copyrights. *Id.* Although other amendments to the franchise tax have followed, the sourcing statute has not materially changed since 1997. Gross receipts derived from a license continue to be sourced to Texas when the license is used in this state. TEX. TAX CODE § 171.103(a)(4).

## D. Receipts From the Use of a License

The Comptroller argues that because TGS uses a license agreement to transfer seismic data to its Texas customers, the receipts are from the use of a license in Texas. She further argues that the phrase "use of a license" encompasses licensing because there is no qualifying language in subsection (4) or in any other part of the sourcing statute to suggest that the licensing of data does not constitute the use of a license. The Comptroller concedes that previously the licensing of seismic data was sourced as a general intangible under the "location of the payor" rule, but she maintains that the Legislature changed that practice in 1997 when it decided to tax licenses like patents and copyrights, according to their place of use.

---

6. In November 1992, the Comptroller renumbered and reorganized Rule 3.403(e)(11) as new Rule 3.549(e)(30). 17 Tex. Reg. 7663 (1992) (to be codified at 34 TEX. ADMIN CODE § 3.549(e)(30)). The reorganization did not substantively change the rule, which now provides that "Revenues received by the owner of a trademark, franchise, and license are included in Texas receipts to the extent used in Texas." *Id.* In 1996, however, the Comptroller returned to the "location of the payor" rule for these intangible assets, amending the rule to provide that "revenues received by the owner of a trademark, franchise, and licence are apportioned to the location of the payor."

21 Tex. Reg. 11511 (1996) (to be codified at 34 TEX. ADMIN. CODE § 3.549). TGS submits that an adverse district court ruling, invalidating an unrelated sourcing rule, caused the Comptroller to make the changes returning revenue derived from patents and copyrights to their unique position as the only receipts from intangible assets sourced according to place of use. TGS further submits that the Comptroller persuaded the Legislature to thereafter amend the sourcing statute in 1997 to adopt the Comptroller's prior practice under Rule 3.403(e)(11) so that she could go back to sourcing these additional intangible assets according to place of use.

TGS argues that the Comptroller and the court of appeals have confused "receipts from licensing" with "receipts from the use of a license." TGS submits that there is a critical distinction between receipts from licensing transactions (in which a license is merely the transfer mechanism) and receipts from the use of a license (in which the license itself is a valuable asset). Because TGS's customers do not use a license but instead use seismic data, TGS submits that the receipts at issue are not from the use of a license but are from its customers' acquisition and use of TGS's data. TGS contends that its receipts are therefore essentially a limited sale of an intangible asset, geophysical data. Because this data is not one of the intangible assets listed in subsection (4), TGS concludes that the receipts it derives from this data must instead be sourced as other business under the catchall provision, subsection (6), and allocated to the state of the payor's domicile. TEX. TAX CODE § 171.103(a)(4), (6).

As the arguments indicate, the term "license" has more than one meaning. It can be used as a verb to convey the act of giving permission or as a noun to represent the permission or right granted. See WEBSTER'S NEW INTERNATIONAL DICTIONARY 1425 (2d ed.1960). As such, its use in the statute is ambiguous.

 Instead of focusing on the word "license," as the Comptroller and court of appeals have done, the word must be read in the context of the whole statute and consideration given to what it means to "use a license." See City of Sunset Valley, 146 S.W.3d at 642; Mega Child Care, 145 S.W.3d at 176. Language cannot be interpreted apart from context. The meaning of a word that appears ambiguous when viewed in isolation may become clear when the word is analyzed in light of the terms that surround it.[7] The word "use" poses some interpretational difficulties as well because of the different meanings attributable to it.[8] "Use" and the "use of a license" therefore, draw their meanings from context, so we look not only to the words themselves but to the statute in its entirety to determine the Legislature's intent.[9] It is a fundamental principle of statutory construction and indeed of language itself that words' meanings cannot be determined in isolation but must be drawn from the context in which they are used.[10]

 The statute sources to Texas "receipts from the use of a patent, copyright, trademark, franchise, or license" to the extent they are used in Texas. TEX. TAX CODE § 171.103(a)(4). The canon of statutory construction known as *noscitur a sociis*, or "it is known by its associates" directs that similar terms be interpreted in a similar manner. See Fiess v. State Farm Lloyds, 202 S.W.3d 744, 750 n. 29 (Tex.2006) (quoting BLACK'S LAW DICTIONARY 1087 (8th ed.2004)). Thus, we inter-

---

7. The United States Supreme Court has noted the difficulty of defining "use" in two criminal cases involving the use of a firearm. These cases provide helpful notes on linguistics for the present case. See Bailey v. U.S., 516 U.S. 137, 143, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995); Smith v. U.S., 508 U.S. 223, 228–29, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993).

8. Bailey, 516 U.S. at 143, 116 S.Ct. 501.

9. See id.

10. Smith v. U.S., 508 U.S. 223, 241, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993)(Scalia, J., dissenting) (citing Deal v. U.S., 508 U.S. 129, 132, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993)) (Justice Scalia notes that this mandate of context is "particularly true of a word as elastic as 'use,' whose meanings range all the way from 'to partake of' (as in 'he uses tobacco') to 'to be wont or accustomed' (as in 'he used to smoke tobacco')").

pret the similar terms license, patent, copyright, trademark, and franchise in a similar manner.

■ Considering how the statute applies to patents and copyrights is therefore instructive. When a business wishes to manufacture a patented item, it must purchase the patent or obtain permission to use the patent from the owner. Permission is usually granted in the form of a license. When the licensee thereafter produces the patented item, it uses the patent, and its payments to the patent's owner are "receipts from the use of a patent." *See* TEX. TAX CODE § 171.103(a)(4). The revenue or royalties that the patent owner receives is included in Texas receipts to the extent that the patent is used in production, fabrication, manufacturing, or other processing in Texas. 34 TEX. ADMIN. CODE § 3.549(e)(30)(A)(i). Even though a license is part of this transaction, the receipts are from the use of the underlying intellectual property, the patent, not from the use of a license.

■ Similarly, when a business wishes to publish copyrighted material, the owner of the copyright must grant permission through a license. When the licensee publishes the copyrighted material, it uses the copyright, and its payments to the owner are receipts from the use of a copyright. *See* TEX. TAX CODE § 171.103(a)(4). Revenue the copyright owner receives from the use of its copyright is included in Texas receipts to the extent the copyright is used in Texas. 34 TEX. ADMIN. CODE § 3.549(e)(30)(A)(ii). Even though a license is part of this transaction, the receipts are from the use of the underlying intellectual property, the copyright, not from the use of a license.

■ In these two situations, the owner of the intangible asset uses a license to convey limited rights to its intellectual property. But the revenue produced is not from the use of a license in Texas; it is from the use of the underlying intellectual property, the copyright or the patent. Similarly, the revenue TGS receives from conveying its geophysical data is not derived from the use of a license but from the use of the underlying intellectual property, the data. The term "license" in subsection (4) of the sourcing statute therefore refers to licenses that are themselves revenue-producing assets. It does not include the mechanism of licensing, which would subsume all intangible assets. Had that been the Legislature's intent, it would not have been necessary to name the intangible assets specifically as the Legislature has done in subsection (4). *See In re M.N.*, 262 S.W.3d at 802 (presuming that the "Legislature included each word in the statute for a purpose . . . and that words not included were purposefully omitted").

E. The Comptroller's Rules

The Comptroller's own administrative interpretation of the sourcing statute further contradicts her argument here. The Comptroller's regulations provide: "revenue that *the owner* of a trademark, franchise, or license receives is included in Texas receipts to the extent the trademark, franchise, or license is used in Texas." 34 TEX. ADMIN CODE § 3.549(e)(30)(A)(iii) (former franchise tax); *id.* § 3.591(e)(21)(A)(iii) (margin tax) (emphasis added). Under this rule, the intangible asset that is "used" must be owned by the revenue recipient and used by someone else. The underlying asset in a licensing transaction meets this standard because it is owned by the licensor, who receives the revenue, not the licensee, who uses the intangible asset. In contrast, the license resulting from a licensing transaction does not meet this standard because the licensee owns the license.

TGS, the revenue recipient, owns seismic data, which is its intellectual property. TGS's customers want to access this valuable intellectual property, and TGS thus grants them a right to access the data through license agreements. TGS grants its customers a license, or a limited right, to use its seismic data. The customers, however, then use the seismic data and not the licenses that vest in them as a result of the licensing transaction. Because TGS is not the owner of the license but the owner of the data, its receipts from customers, who use its seismic data, should not be sourced under subsection (4), and the assessment here conflicts with the Comptroller's own administrative rule. *See* 34 TEX. ADMIN. CODE § 3.549(e)(30)(A)(iii); *see also Rodriguez*, 997 S.W.2d at 254–55; *Mid– Century Ins. Co. of Texas v. Ademaj*, 243 S.W.3d 618, 623 (Tex.2007).

Moreover, the Comptroller's construction of the statute conflicts with her rule regarding the licensing of software. By rule, the Comptroller allocates receipts from licensing software to the location of the payor under subsection (6) as sales of intangibles. *See* 34 TEX. ADMIN. CODE § 3.549(e)(30)(A)(iii), (e)(7); TEX. TAX CODE § 171.103(a)(6). Because a license is used to transfer the underlying intangible, however, the Comptroller's argument in this case would dictate allocation of the receipts under subsection (4). TEX. TAX CODE § 171.103(a)(4). The Comptroller accordingly is inconsistent when equating the licensing of an intangible asset with the use of a license in this state. *See* TEX. TAX CODE § 111.002 (providing that Comptroller's rules must not conflict with state or federal law); *see also Pub. Util. Comm'n*, 809 S.W.2d at 207; *Stanford*, 181 S.W.2d at 273 (stating that an agency's construction of a statute may be considered only if it is reasonable and not inconsistent with the statute).

## III. Conclusion

The Legislature could have allocated receipts from the use of intangible assets in this state to subsection (4) of the sourcing statute, generally, but it did not. *See, e.g.,* TEX. TAX CODE § 171.0004(d) (providing that an "entity conducts an active trade or business if assets, including royalties, patents, trademarks, and *other intangible assets*, held by the entity are used in the active trade or business of one or more related entities") (emphasis added). Some states do allocate revenues from intangible assets generally to the place of their use, but our Legislature has chosen to specifically name the intangibles which qualify for such treatment.[11] Because TGS's re-

11. Compare the Texas statute with Wisconsin's. WIS. STAT. ANN § 71.25(9)(dj) (West 2011) (sourcing gross royalties and "other gross receipts received for the use or license of intangible property, including patents, copyrights, trademarks, trade names, service names, franchises, licenses, plans, specifications, blueprints, processes, techniques, formulas, designs, layouts, patterns, drawings, manuals, technical know-how, contracts, and customers lists are sales in this state if ... [t]he purchaser or licensee uses the intangible property in the operation of a trade or business at a location in this state.") TGS's license of seismic data would certainly fall under this particular statute to the extent that the data was used in Wisconsin, but Texas's statute is not so broad. Several other states have similarly broad sourcing statutes under which TGS's transactions would fall. *See also* LA.REV.STAT. ANN. § 47:243(A)(5) (2011) ("Royalties or similar revenue from the use of patents, trademarks, copyrights, secret processes *and other similar intangible rights* shall be allocated to the state or states in which such rights are used") (emphasis added); 35 ILL. COMP. STAT. ANN. 5/304(a)(3)(B–1)(I) (West 2011) ("Gross receipts from the licensing, sale, or other disposition of a patent, copyright, trademark, *or similar item of intangible personal property*") (emphasis added); MICH. COMP. LAWS ANN. § 208.1305(1)(e) (West 2011) ("Royalties and other income received for the use of or for the privilege of using *intangible*

ceipts from licensing its seismic data are not receipts from the use of a license in this state within subsection (4)'s meaning, the court of appeals erred in upholding the Comptroller's franchise tax assessment in this case. Receipts from this intangible asset are not allocated according to its place of use under subsection (4) but rather are included under subsection (6)'s catch-all provision as a limited sale of an intangible and allocated under the "location of the payor" rule. We therefore reverse the court of appeals' judgment and remand the case to the trial court for further proceedings consistent with this opinion.

Justice HECHT and Justice GUZMAN did not participate in the decision.

*property,* including patents, know-how, formulas, designs, processes, patterns, copyrights, trade names, service names, franchises, licenses, contracts, customer lists, computer software, *or similar items,* are attributed to the state in which the property is used by the purchaser") (emphasis added); OHIO REV.CODE ANN. § 5733.05(B)(2)(c)(ii) (West 2011) ("Receipts from the sale, exchange, disposition, or other grant of the right to use trademarks, trade names, patents, copyrights, *and similar intellectual property* shall be sitused to this state to the extent that the receipts are based on the amount of use of that property in this state") (emphasis added); TENN.CODE ANN. § 67–4–2012(j) (West 2011) ("any person doing business in Tennessee, who licenses the use of patents, trademarks, tradenames, copyrights, or know-how, *or other intellectual property* to another person in Tennessee, and who is paid royalties or other income based on the sale of products or other activity in Tennessee by the licensee, shall source such income to Tennessee") (emphasis added).