

NUMBER 13-14-00093-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**HALLMARK MARKETING
COMPANY, LLC,**                                                        **Appellant,**

**v.**

**SUSAN COMBS, COMPTROLLER OF
PUBLIC ACCOUNTS OF THE STATE OF
TEXAS; AND GREG ABBOTT, ATTORNEY
GENERAL OF THE STATE OF TEXAS,**                        **Appellees.**

---

### On appeal from the 126th District Court
### of Travis County, Texas.

---

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Garza and Longoria
Memorandum Opinion by Justice Garza**

Appellant, Hallmark Marketing Company, LLC ("Hallmark"), challenged the

calculation of its 2008 franchise tax. The trial court denied a motion for partial summary

judgment filed by Hallmark and granted a motion for partial summary judgment filed by

appellees Susan Combs, Comptroller of Public Accounts of the State of Texas, and Greg

Abbott, Attorney General of the State of Texas.  We affirm.[1]

## I. Background

The facts of this case are undisputed.  In 2009, the Comptroller notified Hallmark that, according to audit results, it owed over $200,000 in additional franchise tax payments for the tax year coinciding with calendar year 2008.  Hallmark paid the amount due under protest in 2013 and then filed suit against appellees in Travis County.  *See* TEX. TAX CODE ANN. § 112.051(a) (West, Westlaw through 2013 3d C.S.) (stating that a person who contends that a tax is unlawful "shall pay the amount claimed by the state, and if the person intends to bring suit under this subchapter, the person must submit with the payment a protest" in writing); *id.* § 112.052(a) (West, Westlaw through 2013 3d C.S.) (stating that "[a] person may bring suit against the state to recover [franchise tax] required to be paid to the state if the person has first paid the tax under protest as required by Section 112.051"); *id.* § 112.053(a) (West, Westlaw through 2013 3d C.S.) ("A suit authorized by this subchapter must be brought against the public official charged with the duty of collecting the tax or fee, the comptroller, and the attorney general.").

In its suit, Hallmark alleged that the Comptroller misinterpreted the phrase "net gain from the sale" in subsection (b) of tax code section 171.105.  *See id.* § 171.105(b) (West, Westlaw through 2013 3d C.S.) ("If a taxable entity sells an investment or capital asset, the taxable entity's gross receipts from its entire business for taxable margin includes only the net gain from the sale.").  According to Hallmark, this misinterpretation resulted in the Comptroller assessing an additional $193,168.11 franchise tax for Hallmark in 2008.  Hallmark alleged that, to the extent the Comptroller's regulations

---

[1] This appeal was transferred from the Third Court of Appeals pursuant to a docket equalization order issued by the Texas Supreme Court.  *See* TEX. GOV'T CODE ANN. § 73.001 (West, Westlaw through 2013 3d C.S.).

allowed this interpretation, such regulations are invalid or illegal because they violate the plain language of the statute. Hallmark sought refund of its protest payment, statutory interest, and costs of court.

Both parties filed motions for partial summary judgment. Hallmark's motion requested that the trial court render judgment that it is entitled to a refund of $182,072 in assessed tax plus statutory interest.[2] Appellees' motion, brought on both traditional and no-evidence grounds, argued that it was entitled to judgment as a matter of law and that Hallmark "has not and cannot produce any evidence" that it is entitled to a refund. On December 4, 2013, the trial court rendered judgment granting appellees' motion and denying Hallmark's motion. This appeal followed.[3]

## II. DISCUSSION

### A. Franchise Tax Generally

The franchise tax is imposed on each taxable entity that does business in Texas or that is chartered or organized in Texas. *Id.* § 171.001(a) (West, Westlaw through 2013 3d C.S.). The tax is calculated by applying a tax rate—here, one percent—to the entity's taxable margin. *Id.* § 171.002(a) (West, Westlaw through 2013 3d C.S.). In general, an

---

[2] Hallmark's summary judgment motion stated: "[Hallmark] believes it can reach agreement with Defendants on the issue of the exact amount of assessed interest it paid on the assessed tax, but has not included that issue in this motion."

[3] The December 4, 2013 judgment granted appellees' pretrial motion for partial summary judgment and denied appellant's motion for partial summary judgment. However, it did not state, implicitly or explicitly, that it disposed of all claims and parties or that it was final for purposes of appeal. *See Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 205 (Tex. 2001) (noting that an appeal may ordinarily only be taken from a final judgment and that "when there has not been a conventional trial on the merits, an order or judgment is not final for purposes of appeal unless it actually disposes of every pending claim and party or unless it clearly and unequivocally states that it finally disposes of all claims and all parties"). Accordingly, we abated the appeal and remanded to the trial court for clarification as to whether the December 4, 2013 order was intended to completely dispose of all claims and all parties. *See M.O. Dental Lab v. Rape*, 139 S.W.3d 671, 673 (Tex. 2004) ("[W]e are obligated to review *sua sponte* issues affecting jurisdiction."). On remand, the trial court rendered an order clarifying that it intended by its December 4, 2013 order to dispose of all claims and parties. We therefore reinstated the appeal and will now address the issues presented.

entity's margin is its total revenue minus the greater of (1) cost of goods sold, (2) compensation, or (3) thirty percent of its revenue. *Id.* § 171.101(a)(1) (West, Westlaw through 2013 3d C.S.). An entity's taxable margin is calculated by multiplying its total margin by an "apportionment factor" and by then subtracting any other allowable deductions. *Id.* § 171.101(a)(2), (3). The apportionment factor is a fraction, the numerator of which is the entity's gross receipts from business done in Texas ("Texas receipts"), and the denominator of which is the entity's gross receipts from its entire business ("everywhere receipts"). *Id.* § 171.106(a) (West, Westlaw through 2013 3d C.S.).

## B.      Standard of Review

We review summary judgments de novo. *Neely v. Wilson*, 418 S.W.3d 52, 59 (Tex. 2013); *Nalle Plastics Family L.P. v. Porter, Rogers, Dahlman & Gordon, P.C.*, 406 S.W.3d 186, 199 (Tex. App.—Corpus Christi 2013, pet. denied). A motion for traditional summary judgment must show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). We will affirm a summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 157 (Tex. 2004).

Questions of statutory construction are also reviewed de novo. *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). Our primary objective when construing a statute is to give effect to the Legislature's intent. *See id.* We seek that intent first and foremost in the statutory text, *see id.*, and we rely on the plain meaning of the text unless a different meaning is supplied by legislative definition or enforcing the plain language would produce absurd results. *See Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009). If a statute uses a term with a particular meaning or assigns a particular

4

meaning to a term, we are bound by the statutory usage. *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011). Undefined terms in a statute are typically given their ordinary meaning, but if a different or more precise definition is apparent from the term's use in the context of the statute, we apply that meaning. *Id.*; *see* TEX. GOV'T CODE ANN. § 311.011 (West, Westlaw through 2013 3d C.S.).

**C. Analysis**

The only figure in dispute here is the denominator of the apportionment factor applicable to Hallmark for 2008—that is, Hallmark's gross receipts from its entire business for that year. *See id.* § 171.106(a). Gross receipts are defined as "the sum of the taxable entity's receipts from: (1) each sale of the taxable entity's tangible personal property; (2) each service, rental, or royalty; and (3) other business." *Id.* § 171.105(a) (West, Westlaw through 2013 3d C.S.). However, if "[i]f a taxable entity sells an investment or capital asset, the taxable entity's gross receipts . . . includes only the net gain from the sale." *Id.* § 171.105(b). The Comptroller's interpretation of this latter provision is at issue in this case.

According to the Comptroller's audit, Hallmark grossed $4,516,155,458 in receipts in 2008 but it sustained $628,243,514 in losses on sales of investments and capital assets in that year. The Comptroller calculated Hallmark's everywhere receipts for 2008 by taking the gross amount and subtracting the investment and capital losses, resulting in a figure of $3,887,911,944 and a resultant apportionment factor of 6.49%. Hallmark asserts that the investment and capital losses should not have been subtracted because section 171.105 provides that "only the net *gain* from the sale" of investments or capital assets are included in gross receipts. *See id.* (emphasis added). Because Hallmark's 2008 investment and capital transactions resulted in no net *gain*, but rather a net *loss*, Hallmark

5

argued that "zero receipts" from the sale of capital and investment assets should have been included in the calculation of its everywhere receipts. Under Hallmark's interpretation, its apportionment factor would be 5.54%.

Appellees contended in their summary judgment motion and on appeal that the Comptroller's interpretation should be upheld for three reasons: (1) losses such as those sustained by Hallmark are statutorily defined as "amounts reportable as income" and must therefore be deducted from everywhere receipts; (2) the Third Court of Appeals held in 1974 that the predecessor statute unambiguously "requires that gains and losses be offset against one another in order that a net figure be obtained," *Calvert v. Electro-Sci. Investors, Inc.*, 509 S.W.2d 700, 702 (Tex. Civ. App.—Austin 1974, no writ); and (3) the interpretation was based on a Comptroller Rule which is a reasonable construction of the statute. We start by addressing the third reason because it is dispositive.

Appellees argue that the Comptroller's interpretation of the statutory provision at issue is supported by Comptroller Rule 3.591, which states in relevant part:

> (e) Treatment of specific items in the computation of gross receipts.
>
> . . . .
>
> (2) Capital assets and investments. Except as provided by paragraph (16) of this subsection [regarding loans and securities, not applicable here], net gains and losses from sales of investments and capital assets must be added to determine the total gross receipts from such transactions. If both Texas and out-of-state sales have occurred, then a separate calculation of net gains and losses on Texas sales must be made. *If the combination of net gains and losses results in a net loss, the taxable entity should net the loss against other receipts*, but not below zero. In no instance shall the apportionment factor be greater than 1. . . .

34 TEX. ADMIN. CODE § 3.591 (West, Westlaw through 39 Tex. Reg. 6942) (emphasis added). According to appellees, this administrative rule is valid because it does not

6

conflict with any provision of the tax code. *See* TEX. TAX CODE ANN. § 111.002(a). Hallmark argues that the Comptroller's interpretation is entitled to no deference by this Court because the rule conflicts with unambiguous statutory language. *See TGS-NOPEC*, 340 S.W.3d at 438.

When reviewing an agency's interpretation of a statute that it is charged with enforcing, we first consider whether the statute is ambiguous. *See R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 625 (Tex. 2011). If the legislature's intent is "clear and unambiguous under the language of the statute, that is the end of the inquiry." *Id.* If the statute is ambiguous, however, we will uphold the agency's construction if it is reasonable and in accord with the statute's plain language. *Id.*

The Comptroller is charged with administering the provisions of the franchise tax. *See* TEX. GOV'T CODE ANN. § 403.011 (West, Westlaw through 2013 3d C.S.) (enumerating general powers of the Comptroller's office). The Legislature has given the Comptroller broad discretion to adopt rules for the collection of taxes and other revenues so long as such rules do not conflict with state or federal law. *See* TEX. TAX CODE ANN. § 111.002(a) (West, Westlaw through 2013 3d C.S.) ("The comptroller may adopt rules that do not conflict with the laws of this state or the constitution of this state or the United States for the enforcement of the provisions of this title and the collection of taxes and other revenues under this title."). Because the Comptroller is the administrative agency charged with enforcing the tax code, its construction of the code is entitled to "serious consideration." *TGS-NOPEC*, 340 S.W.3d at 438. But we defer to the agency's interpretation only to the extent that the interpretation is reasonable. *Id.* (noting that "[i]f there is vagueness, ambiguity, or room for policy determinations in a statute, we normally

7

defer to the agency's interpretation unless it is plainly erroneous or inconsistent with the language of the statute, regulation, or rule").

We find that tax code section 171.105(b) is ambiguous but we agree with appellees that Rule 3.591 is a reasonable construction of the statute and is in accord with the statute's plain language. *See id.* As noted, the statute provides that "[i]f a taxable entity sells an investment or capital asset, the taxable entity's [everywhere receipts] includes only the net gain from the sale." TEX. TAX CODE ANN. § 171.105(b). The ambiguity arises because it is unclear, by examining only the plain language of the statute, what the term "net gain" means. On the one hand, "net gain" may refer to the particular gain or loss that results from each individual sale when proceeds are offset by costs. Under this reasonable construction of the statute, losses resulting from any individual investment or capital asset sale would not be deducted when calculating Hallmark's everywhere receipts.

On the other hand, "net gain" may instead refer to the taxpayer's cumulative gain or loss on its various investment and capital asset sales made throughout the year. Under this construction of the statute, which the Comptroller has adopted in Rule 3.591, any losses from individual investment and capital asset sales are used to offset gains from other such sales occurring during the tax year. This construction is reasonable for the reasons described in the Austin Court of Civil Appeals' 1974 *Electro-Science* opinion. *See* 509 S.W.2d at 702.[4] In that case, taxpayer Electro-Science brought suit against the Comptroller seeking to recover a franchise tax payment it had made under protest. *Id.* at

---

[4] Because this is a transfer case, we are required to apply the precedent of the transferor court—the Third Court of Appeals, formerly known as the Austin Court of Civil Appeals—to the extent it may differ from ours. TEX. R. APP. P. 41.3.

8

700. Electro-Science argued that the Comptroller incorrectly interpreted the word "net" as it appeared in the predecessor of the statute at issue in the instant case, which provided in relevant part:

> For the purpose of this Article, the term 'total gross receipts of the corporation from its entire business' shall include all of the proceeds of all sales of the corporation's tangible personal property, all receipts from services, all rentals, all royalties and all other business receipts, whether within or outside of Texas. Provided, however, that, as to the sale of investments and capital assets, the term 'total gross receipts of the corporation from its entire business' shall include only the Net gain from such sales.

*Id.* at 701 (citing VERNON'S ANN. TEX. STAT. TAXATION-GENERAL art. 12.02(d), *repealed by* Act of June 10, 1981, 67th Leg., R.S., ch. 389, § 39(a), 1981 Tex. Gen. Laws 1785).[5] The Comptroller interpreted the statute so that gains resulting from Electro-Science's investment and capital transactions were included in its gross receipts; but any losses from other such transactions were not applied to offset the gains. *Id.* In response, Electro-Science made the following argument:

> to have a 'net gain' (or for that matter net loss) there are assumed to be a series of sales or transactions whereby either a gain or a loss can occur, so that by evaluating or comparing the results of such sales or transactions, a 'net gain' can be determined. If such were not the case, the word 'net' in the statute would be of no effect, since 'gain' from such sales would accomplish the result sought by appellants without the inclusion of the modifying term 'net.'

*Id.* The Austin Court of Civil Appeals, noting that courts must generally construe statutes according to the plain meaning of their words, agreed with Electro-Science and concluded as follows:

---

[5] The legislation repealing the predecessor statute and enacting tax code section 171.105 states that the Legislature intended only to recodify the predecessor statute; it did not intend to effect a substantive change in the law. Act of June 10, 1981, 67th Leg., R.S., ch. 389, § 40, 1981 Tex. Gen. Laws 1787 ("This Act is intended as a recodification only, and no substantive change in the law is intended by this Act.").

Webster's New International Dictionary, Second Edition, defines 'net': 'to produce or gain as clear profit; as he Netted a thousand dollars by the operation.' By the plain meaning of the words in the statute we must conclude that net gain requires that gains and losses be offset against one another in order that a net figure be obtained. There is no ambiguity in the language of the statute in question, and there is no doubt as to what its ordinary meaning is. As well-intentioned as the interpretation chosen by the Comptroller may be, we have no choice but to set it aside.

*Id.* at 702 (internal citation omitted).

Considering the plain language of the statute and the Third Court of Appeals' precedent in *Electro-Science*, we find that the Comptroller's interpretation of tax code section 171.105(b) is reasonable. Accordingly, we defer to it. *See TGS-NOPEC*, 340 S.W.3d at 438.[6]

## IV. CONCLUSION

The trial court's judgment is affirmed.

DORI CONTRERAS GARZA,
Justice

Delivered and filed the
13th day of November, 2014.

---

[6] In light of our conclusion, we need not address whether the Comptroller's interpretation was supported on other grounds. *See* TEX. R. APP. P. 47.1.

10