# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-19-00740-CV

---

**1st Global, Inc., Appellant**

**v.**

**Glenn Hegar, Comptroller of Public Accounts of the State of Texas, and Ken Paxton, Attorney General of the State of Texas, Appellees**

---

**FROM THE 53RD DISTRICT COURT OF TRAVIS COUNTY
NO. D-1-GN-18-003916, THE HONORABLE DUSTIN M. HOWELL, JUDGE PRESIDING**

---

## DISSENTING OPINION

I respectfully dissent. I disagree with the Court's conclusion that the phrase "the amount claimed by the state" in Section 112.051(a) of the Tax Code does not include the franchise tax owed to the state that is calculated each year by taxable entities and must be paid with their regular annual report by May 15. Instead, I would conclude that the phrase unambiguously includes the franchise-tax amount that the Tax Code imposes annually "on each taxable entity that does business in this state or that is chartered in this state" and that the Code requires to be paid on May 15 each year. Tex. Tax Code §§ 171.001(a) (imposing tax), .152(c) (establishing date upon which payment is due). Failure to timely pay this mandatory self-assessed tax amount and submit the required annual report can result in a corporation's loss of corporate privileges, as well as penalties for delinquent taxes and other enforcement actions. *Id.* §§ 171.152(c), .202(a)-(b) (requiring filing of annual report on forms supplied by Comptroller), .251 (providing that

Comptroller shall forfeit corporate privileges of corporation if corporation does not file report and pay tax after receiving notice of forfeiture), .362 (establishing penalties for failure to pay tax when due and payable or to file report when due); *see generally id.* §§ 171.351-363 (Subchapter H, Enforcement). Consequently, considering the statutory language in the context of the entire Tax Code as we must, *see TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011), I would conclude that the Comptroller, acting on behalf of the State, "claims" that taxable entities owe the State franchise taxes to be paid each year in the amount prescribed by the Tax Code, and thus a taxable entity may file a protest letter with its annual report challenging any portion of that amount owed that it contends is unlawful. Accordingly, I dissent from the Court's holding that a taxpayer can never pay under protest its annual self-assessed franchise-tax amount due on May 15 and then later file a protest suit.

The Comptroller asserts that "protest suits are reserved for those who[m] the Comptroller has demanded to pay a specific amount" and that the only remedy now available to 1st Global is to request a refund of the amounts at issue and proceed with an administrative hearing for Tax Report Year 2018, *see* Tex. Tax Code § 111.104 (authorizing refund claim), to be followed by a refund suit if it were dissatisfied with the outcome of that proceeding, *see id.* § 112.151 (allowing suit after denial of refund request). The Court agrees, and it holds that until the Comptroller reviews an annual report and assesses a liability, conducts an audit, issues a jeopardy determination, determines a deficiency, or issues a refund denial for 2018, 1st Global cannot challenge the lawfulness of the tax. (Slip op. at 6-7.) However, the Texas Legislature chose not to limit the broad language—"the amount claimed by the state"—to an amount that the Comptroller calculates that a particular taxpayer has underpaid on the original "amount claimed by the state." If the Legislature had sought to limit protest suits to situations in which the

Comptroller assesses a liability, conducts an audit, issues a jeopardy determination, determines a deficiency, or issues a refund denial, as the Comptroller contends and the Court now holds, the Legislature would have included language specifying that protest suits are limited to those circumstances. *See TGS-NOPEC*, 340 S.W.3d at 439 (noting that courts presume the Legislature carefully chooses a statute's language, "purposefully omitting words not chosen").

While it is true that protest suits are most often filed after the Comptroller takes some action to inform a taxpayer that it has underpaid the amount claimed by the state, the statutory language does not limit a taxpayer's ability to file a protest suit to only those situations. The Comptroller asserts that if a taxpayer has reason to believe that the Comptroller will disagree with the taxpayer about the amount that the taxpayer owes, the taxpayer has only two options. The first option is to pay the amount it would owe under the Comptroller's position, request a refund of the amount it believes to be unlawful, request a hearing if the Comptroller denies its refund request, and once its administrative remedies are exhausted, file a refund suit. *See* Tex. Tax Code §§ 111.104 (allowing refund claims), .105 (allowing taxpayer to request hearing if Comptroller denies refund claim), 112.151 (allowing taxpayer to file refund suit after exhaustion of administrative remedies). The taxpayer's second option is to pay only the amount it believes it owes and wait for the Comptroller to perform an audit or review the report, assess the taxpayer's additional liability for the disputed amount, and issue a deficiency determination or a jeopardy determination, at which point the taxpayer can pay the amount under protest and file a protest suit. *See id.* §§ 111.004 (providing Comptroller with power to examine books and records necessary for conducting examination), .0043 (detailing general audit and prehearing powers), .008 (establishing that Comptroller may compute and determine amount of tax to be paid if he "is not satisfied with a tax report or the amount of the tax required to be paid to the state by a person" and

3

then must provide notice of deficiency determination to taxpayer), .009 (requiring petition for redetermination to be filed before expiration of 60 days after date notice of determination is issued and allowing taxpayer to request hearing and file motion for rehearing if dissatisfied with Comptroller's decision on motion for redetermination), .022 (establishing that Comptroller shall issue jeopardy determination stating amount due and that tax collection is in jeopardy if he believes collection of tax required to be paid to state or amount due for tax period is jeopardized by delay and further establishing that jeopardy-determination amount becomes due and payable immediately), 112.052 (allowing suit to recover tax paid under protest).  Under the second option, the taxpayer is liable for interest and penalties.  *See id.* §§ 111.060 (establishing that yearly interest rate on all delinquent taxes is prime rate plus one percent and that delinquent taxes draw interest beginning 60 days after due date), .061 (imposing penalty of at least 5% of tax due on person who fails to pay tax imposed or file report required by Title 2, e.g., franchise tax, when due).

The history of 1st Global's engagement with the Comptroller illustrates why, under the particular circumstances present here, a taxpayer should be able to protest with payment the annual amount of franchise taxes owed and not be required to wait for a review or an audit followed by an assessment or a jeopardy or deficiency determination from the Comptroller.  The unusual situation present here also illustrates why most taxpayers are unlikely to take the step that 1st Global has taken of initiating litigation with the Comptroller, which means this construction of the statutory language would not result in a sudden abundance of such suits, as the Comptroller implies.

The underlying dispute between 1st Global and the Comptroller began in 2012 when 1st Global's CPAs reviewed 1st Global's annual tax reports for 2008, 2009, 2010, and 2011 and discovered that 1st Global had apportioned revenue by its out-of-state financial advisors to

4

Texas. 1st Global then filed amended tax reports correcting the error and sought refunds for the franchise taxes that 1st Global believed it had overpaid. The Comptroller audited the amended annual reports. Two years later, in 2014, the Comptroller denied 1st Global's refund requests. In response, 1st Global timely filed formal refund claims for all four years, seeking to recover $503,846 in overpaid tax, and requested a refund hearing to contest the Comptroller's position. 1st Global subsequently requested status updates and resolution eighteen times. In his Tax Position Letter and in his Response to Interrogatories served in connection with the administrative proceedings, the Comptroller has stated that 1st Global must calculate its Texas franchise-tax liability by apportioning all of its revenues at issue to Texas. Seven years later, 1st Global's refund claims are still pending before the Comptroller.

Between 2012 and 2016, 1st Global filed its report and paid the amount that it calculated was owed, using the apportionment method that it asserts is the correct one. Had the Comptroller audited 1st Global and issued a tax assessment for those years, then 1st Global could have paid the amount under protest and filed its protest suit in district court. The Comptroller has not done so. However, as 1st Global pointed out at the hearing on the plea to the jurisdiction, because the difference between the tax owed under 1st Global's apportionment method and the tax it would owe under the Comptroller's method is more than 25%, there is no statute of limitations that establishes a deadline by which the Comptroller must audit its report. *See id.* § 111.205(b) (providing that four-year statute of limitation established in Section 111.201 does not apply and Comptroller may assess tax imposed by Title 2 at any time if information contained in report contains "gross" error, defined as underpayment of at least 25%). Thus, 1st Global must carry on its books the liability of potential taxes, interest, and penalties that goes back almost ten years with no potential ending date.

5

Faced with this large and annually growing liability, which affects its ability to make business decisions, 1st Global determined in 2017 that under the plain language of the Tax Code, it could pay under protest the amount claimed by the State and file suit. It did so, but this Court dismissed that suit because we determined that 1st Global had not timely filed its protest statement because it filed the statement with its later-filed franchise-tax report instead of filing it when an extension of time to file its report was requested and payment was made.[1] *See Hegar v. 1st Glob., Inc.*, No. 03-18-00411-CV, 2019 WL 6765754, at *5 (Tex. App.—Austin Dec. 12, 2019, no pet.) (mem. op.) ("*1st Global I*") (reversing trial court's denial of Comptroller's motion to dismiss and rendering judgment dismissing 1st Global's protest suit because we determined that exception allowing later filing applied only to smaller taxpayers).

We explained in *1st Global I* that our construction of the relevant statutes and rules to require a larger taxpayer like 1st Global to file its protest letter at the time it seeks an extension to file its report comports with both the statutory language and the Legislature's purpose in providing for both protest and refund suits:

> A protest suit is intended to "provide an adequate legal remedy whereby a taxpayer may test the validity of a tax without having to resort to the traditional equitable remedy of injunction, which would restrain the state's collection of the tax and disrupt the tax-collection process," while a refund suit allows the Comptroller "to refund the payment of certain taxes found to have been paid through mistake of fact

---

[1] After 1st Global filed its protest suit in October 2017, the Comptroller abated the administrative proceedings for Report Years 2008 through 2011 "[t]o avoid the possibility of the administrative body and the courts arriving at inconsistent decisions on the same question." At the time the suit was abated, the Tax Division's Reply to 1st Global's Amended Response to the Tax Division's Position Letter was the next procedural step that was supposed to occur. Because the suit underlying this appeal was filed before the 2017 suit was dismissed, the Comptroller never lifted the abatement. The Comptroller asserts in his brief that he offered to lift the abatement and proceed with 1st Global's administrative hearing after the hearing on the plea to the jurisdiction in this suit, but that 1st Global never responded when the Comptroller "attempted to lift the stay by agreement." 1st Global replies that it never requested an abatement and that it "would like the Comptroller to resolve its 2008-2011 administrative claims post haste."

or law, thereby relieving the legislature of time-consuming claims made directly to lawmakers."

*Id.* (quoting *Strayhorn v. Lexington Ins.*, 128 S.W.3d 772, 779 n.9 (Tex. App.—Austin 2004), *aff'd*, 209 S.W.3d 83 (Tex. 2006)). We further noted that "it is logical to conclude that a taxpayer of such a size that it has paid sufficient taxes in past years to fall within the [electronic funds transfer] provisions of Subsection (e) will often know that it believes the franchise-tax framework is invalid or does not apply at the time it seeks an extension to file its report, as opposed to [filing] a later refund request that contests the amount of taxes assessed by the Comptroller based on the taxpayer's franchise-tax report" and that 1st Global knew the grounds for its protest because it had pending requests for refunds from past years. *Id.* & n.7.

In 2018, 1st Global submitted a protest letter with the payment it made on May 15 to extend its deadline to file its regular annual report and submitted the letter again on July 16 when it filed its report and the remainder of the payment claimed by the State based on 1st Global's regular annual report. 1st Global paid under protest a total of $184,912 in franchise taxes for Report Year 2018 and seeks recovery of $123,205. In response to 1st Global's requests for disclosure, the Comptroller reiterated that he maintains his position expressed in the 2008-2011 administrative proceedings that 1st Global should apportion its revenue to Texas because its revenue is created by its performance of services at its Dallas office. It is difficult to square the Comptroller's argument that 1st Global's suit should be dismissed because "no amount has been claimed by the state" with his continued position that 1st Global should apportion its revenue as it did in its 2018 regular annual report; that is, all of its receipts should be apportioned to Texas regardless of where its financial advisors provided their services.

Furthermore, even under the Court's proposed construction of the statutory language, as the Court points out in its opinion, in this specific case, the Comptroller has already made a claim:

> The underlying dispute between 1st Global and the Comptroller goes back several years and involves how 1st Global's gross receipts should be apportioned for franchise-tax purposes. Under the Texas Tax Code, apportionment of taxable margin is based on a taxable entity's "business done in this state." Tex. Tax Code § 171.103(a)(2). ***In a separate administrative proceeding involving 1st Global, the Comptroller previously announced his position that receipts generated through the provision of services by 1st Global's financial advisors, wherever they are located, should all be apportioned to Texas because of its Dallas office.*** 1st Global, on the other hand, asserts that it earns its revenues in the states where its advisors perform services on its behalf, which would result in its owing substantially less franchise taxes to the State of Texas.

(Slip op. at 2) (emphasis added). The Comptroller continues to assert his position in this litigation, meaning that he "claims" that 1st Global's 2018 franchise tax should be calculated the way that 1st Global calculated it.

Most importantly, however, in my view, the plain language of Section 112.051(a) provides a taxpayer with a third option for challenging a tax that it believes is unlawful: paying the amount of its self-assessed franchise-tax liability under protest with its timely filed regular annual report. The Texas Supreme Court explicitly recognized the validity of this option when it allowed a taxpayer's second suit challenging the franchise tax as unconstitutional to proceed after dismissing the taxpayer's first suit for want of jurisdiction because the taxpayer had failed to comply with the statutory prerequisite of first paying the tax under protest. *Compare In re Nestle USA, Inc.*, 387 S.W.3d 610, 616 (Tex. 2012) (orig. proceeding) ("*In re Nestle II*") (explaining that in prior suit, supreme court "held that payment under protest was a jurisdictional prerequisite to [taxpayer's] challenge and dismissed the proceeding. Nestle then paid the $8,682,999 due for 2012

8

under protest and re-filed its challenge."), *with In re Nestle USA, Inc.*, 359 S.W.3d 207, 208-10 (Tex. 2012) (orig. proceeding) ("*In re Nestle I*") (dismissing taxpayer's first suit for want of jurisdiction). Contrary to the Court's conclusion that the supreme court's decision in *In re Nestle II* does not constitute "an affirmative and authoritative decision" on this jurisdictional issue because it was neither raised by the parties nor discussed in the court's opinion, the supreme court considered precisely the issue of whether a taxpayer could file a protest suit after paying its self-assessed tax under protest in *In re Nestle I*. The fact that no one raised the issue of whether that self-assessed tax was an "amount claimed by the state" speaks to the unambiguous nature of the phrase. And although the Comptroller attempts to distinguish the *Nestle* cases because the taxpayer there sought to challenge the constitutionality of the franchise tax rather than the legality of the Comptroller's position on how the taxpayer should calculate the amount of tax due on its report, in effect arguing that a taxpayer can pay under protest with its annual report only if it intends to challenge the entire amount of tax due rather than some portion of the tax, there is no such limitation present in Section 112.051(a).[2]

Because I would conclude that 1st Global has complied with the statutory prerequisite to establish a waiver of sovereign immunity by timely paying "the amount claimed by the state" under protest, I respectfully dissent.

---

[2] If this were true, Section 112.051(a) also would allow a taxpayer to challenge only the entire amount of tax due when filing a protest suit after an assessment, a deficiency or jeopardy determination, or a denied refund claim, but there is no statutory language in Section 112.051(a) indicating that the Legislature intended such a result. Indeed, because the protest statement must set forth each reason for recovering the payment, and because the issues in the suit are limited to those issues arising from the reasons expressed in the written protest, the statutory scheme contemplates that a taxpayer may seek recovery for only some portions of the tax paid if it challenges only some parts of how the tax is calculated by the Comptroller. *See* Tex. Tax Code §§ 152.051(b), .053(b).

_____

Gisela D. Triana, Justice

Before Justices Baker, Triana, and Jones*

Filed:   October 29, 2021

*Before J. Woodfin Jones, Chief Justice (Retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code § 74.003(b).