# Supreme Court of Texas

No. 21-0470

Collin Creek Assisted Living Center, Inc. d/b/a/ DaySpring
Assisted Living Community,

*Petitioner*,

v.

Christine Faber, Individually and as Heir at Law of Carmelina
"Millie" Smith, Deceased,

*Respondent*

On Petition for Review from the
Court of Appeals for the Fifth District of Texas

JUSTICE BOYD, joined by Justice Lehrmann and Justice Devine,
dissenting.

As the Court explains, a claim alleging that a health care provider
violated regulatory safety standards constitutes a health care liability
claim under the Texas Medical Liability Act only if, "at a minimum,
there [is] a 'substantive nexus between the safety standards allegedly
violated and the provision of health care.'" *Ante* at 10 (quoting *Ross v.
St. Luke's Episcopal Hosp.*, 462 S.W.3d 496, 504 (Tex. 2015)). Christine
Faber claims in this case that the DaySpring Assisted Living
Community violated safety standards when it caused the death of her

mother, Carmelina "Millie" Smith, but nothing in this record indicates that those standards had *any* relationship to "health care" as the Act defines that term. More specifically, nothing indicates that DaySpring provided *any* health care to Smith at all. In fact, DaySpring required Smith and Faber to sign a form created by DaySpring acknowledging that DaySpring "does NOT provide . . . health care services (other than assistance with medication administration, if requested)." Because DaySpring did not provide "health care" to Smith, the safety standards it allegedly violated have no substantive nexus to health care, so Faber's claim against DaySpring cannot constitute a "health care liability claim." I respectfully dissent.

## I.
## "Health Care Liability Claim"

A claim qualifies as a health care liability claim under the Texas Medical Liability Act (TMLA) if: (1) the defendant is a physician or health-care provider; (2) the claim alleges "treatment, lack of treatment, or a departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care;" and (3) the defendant's conduct proximately caused the claimant's injury or death. *Tex. W. Oaks Hosp., LP v. Williams*, 371 S.W.3d 171, 180 (Tex. 2012) (citing TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13)).[1]

---

[1] "Health care liability claim" means

a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or

2

Regarding the first element, an assisted living facility like DaySpring qualifies as a health-care provider under the TMLA. TEX. CIV. PRAC. & REM. CODE § 74.001(a)(11)(B), (12)(A)(vii). But that does not mean that *every*thing—or even *any*thing—a particular assisted living facility does constitutes "health care" under the TMLA. The second element determines that question.

Addressing the second element, the Court does not consider whether Faber's claim alleges a departure from accepted standards of "medical care" or "health care." Instead, it concludes that the claim falls within the definition's "safety standards" prong because it effectively alleges that DaySpring's personal-care assistant violated safety standards that governed Dayspring's provision of services to Smith. *Ante* at 15–16. But as the Court acknowledges, *see id.* at 10, a claim falls within the TMLA's safety-standards prong only if "a substantive nexus" exists "between the safety standards allegedly violated and *the provision of health care.*" *Ross*, 462 S.W.3d at 504 (emphasis added).[2]

_____

professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13).

[2] As the Court notes, we also stated in *Ross* that the "pivotal issue in a safety standards-based claim is whether the standards on which the claim is based *implicate* the defendant's duties as a health care provider, including its duties to provide for patient safety." *Ross*, 462 S.W.3d at 505 (emphasis added). Repeatedly relying on this statement, the Court suggests that a claim is a health care liability claim whenever (1) the defendant qualifies as a health care provider, and (2) the claim alleges that the defendant violated a regulatory safety standard that applies to the defendant. *See ante* at 15–16, 21, 22 & n16.

3

To determine whether the safety standards DaySpring allegedly violated have a "substantive nexus" to "the provision of health care," we must first determine what the TMLA means by "health care." Under the TMLA, "health care" means any act performed by a health-care provider "for, to, or on behalf of a patient during the patient's *medical* care, treatment, or confinement." TEX. CIV. PRAC. & REM. CODE § 74.001(a)(10) (emphasis added). "Medical" care, in turn, means "any act defined as practicing medicine under Section 151.002, Occupations Code, performed or furnished, or which should have been performed, by one licensed to practice medicine in this state for, to, or on behalf of a patient during the patient's care, treatment, or confinement." *Id.* § 74.001(a)(19).[3] Under these definitions—as we explained just last

---

But we rejected that exact argument when we applied *Ross* in two subsequent per curiam opinions: *Reddic v. E. Tex. Med. Ctr. Reg'l Health Care Sys.*, 474 S.W.3d 672, 675–76 (Tex. 2015), and *Galvan v. Mem'l Hermann Hosp. Sys.*, 476 S.W.3d 429, 432–33 (Tex. 2015). In *Reddic*, we held that a hospital visitor's claim based on a slip-and-fall in the hospital's lobby was not a health care liability claim even though it alleged the hospital violated safety standards governing the safety of its lobby floors because "the record does not support a conclusion that safety standards regarding maintenance of the floor and mats where Reddic fell were substantively related to the safety of patients receiving health care or persons seeking health care." 474 S.W.3d at 676. We applied the same reasoning in *Galvan*, holding that a similar claim involving a visitor's slip-and-fall in a hospital hallway was not a health care liability claim. 476 S.W.3d at 432–33. As these cases confirm, the mere fact that (1) DaySpring qualifies as a health care provider and (2) Faber alleges that DaySpring violated a safety standard that "implicates" its duties to its residents does not make Faber's claim a health care liability claim. Instead, the safety standard itself must have a "substantive nexus" to DaySpring's "provision of health care." *Ross*, 462 S.W.3d at 504.

[3] Because the TMLA expressly defines the terms "health care" and "medical care," we must apply those definitions even if the terms might bear other meanings in different circumstances. *See* TEX. GOV'T CODE § 311.011;

4

term—"physicians provide 'medical care' and health care providers provide 'health care,'" but "health care providers provide health care *only* when they furnish treatment to a patient *'during'—or as part of— a physician's provision of 'medical care.'" *Lake Jackson Med. Spa, Ltd. v. Gaytan*, 640 S.W.3d 830, 841 (Tex. 2022) (quoting TEX. CIV. PRAC. & REM. CODE § 74.001(a)(10)) (emphasis added). So the care that DaySpring provided to Smith would qualify as "health care" only if DaySpring provided that care as part of a physician's provision of "medical care" to Smith.

As the Court explains, we "have held that although a claim alleging a 'breach of health-care or medical-care standards must involve a physician–patient relationship' to qualify as a health care liability claim, a claim alleging a 'breach of safety, professional-services, or administrative-services standards' need not." *See ante* at 15 (quoting *Gaytan*, 640 S.W.3d at 841)). But those holdings referred only to physician–patient relationships *between the claimant and the defendant. See Gaytan*, 640 S.W.3d at 841; *Tex. W. Oaks Hosp.*, 371 S.W.3d at 178. A claim alleging violations of safety standards may qualify as a health care liability claim even if the claimant has no physician–patient relationship with the defendant, but only if the safety standards at issue have a substantive nexus to health care. *See Ross*, 462 S.W.3d at 504–05. And to have a substantive nexus to "health care," the standards must have a substantive relationship to care provided as

---

*TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011) ("If a statute uses a term with a particular meaning or assigns a particular meaning to a term, we are bound by the statutory usage." (citing *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002)).

part of a physician's provision of "medical care." *See Gaytan*, 640 S.W.3d at 841.

Thus, for a safety-standards claim to qualify as a health care liability claim, the claimant need not have a physician–patient relationship with the defendant, but the defendant must be providing "health care," and it can be providing health care as the TMLA defines that term only if it is providing care as part of a physician's provision of medical care to the claimant. If it is not, the safety standards can have no "substantive nexus" to health care. This is not—as the Court accuses—a new "strict rule" I propose today as a replacement for the *Ross* factors, *see ante* at 16, it is the very rule we announced in *Ross* when we construed the TMLA to require a "substantive nexus . . . between the safety standards allegedly violated and *the provision of health care.*" *Ross*, 462 S.W.3d at 504 (emphasis added).[4]

## II.
## Assisted Living Facilities

Having determined the meaning of "health care" under the TMLA, and before addressing the evidence in this case, it is important to clarify the nature of an "assisted living facility." Under Chapter 247

---

[4] The Court's approach fails to appreciate the fact that the claims in *Ross* arose from a very different factual context than this case. In *Ross*, a hospital visitor who was not receiving any health care from the hospital slipped and fell in the hospital's lobby. It was undisputed, of course, that the hospital provided health care. *See* 462 S.W.3d at 503. The issue was whether the safety standards governing the hospital's maintenance of the lobby floor had a substantive nexus to that health care. *See id.* at 504. As discussed below, the safety standards governing DaySpring's conduct in assisting a resident to her car could have no substantive nexus to health care because DaySpring was not providing health care at all.

of the Texas Health and Safety Code—which addresses and governs assisted living facilities in Texas—assisted living facilities may, but are not required to, provide health care. An assisted living facility is simply an "establishment" that provides (1) *food and shelter* to four or more persons who are unrelated to the proprietor of the establishment," and (2) *either* "personal care services" *or* "administration of medication by a person licensed or otherwise authorized in this state to administer the medication." TEX. HEALTH & SAFETY CODE § 247.002(1)(A), (B) (emphasis added); *see* 26 TEX. ADMIN. CODE § 553.7(a).[5]

"Personal care services" means "[a]ssistance with feeding, dressing, moving, bathing, or other personal needs or maintenance," or "general supervision or oversight of the physical and mental well-being of a person who needs assistance to maintain a private and independent residence in an assisted living facility or who needs assistance to manage the person's personal life, regardless of whether a guardian has been appointed for the person." TEX. HEALTH & SAFETY CODE § 247.002(5). By providing "personal care services," assisted living facilities provide a general form of "care" that promotes "resident

---

[5] By rule, an assisted living facility that contracts with the government to provide care to clients of the Texas Department of Human Services Community Based Alternatives Assisted Living/Residential Care Program or the Community Care for the Aged and Disabled Residential Care Program must also provide basic "home management" services (which include changing bed linens, housecleaning, laundry, shopping, storing supplies, and washing dishes), transportation and escort services, social and recreational activities, participation in assessments by an outside licensed nurse, and emergency care while the facility seeks a permanent placement in a more appropriate institution. 40 TEX. ADMIN. CODE § 46.1, .41(b)(2)–(6). This record includes no indication that DaySpring provides services pursuant to such a contract.

7

independence and self-determination," "humane treatment," "conservative intervention," "access to care," "continuity of care," "coordination of services," "safe surroundings," "professionalism of service providers," "participation in useful studies," and "quality of life." *Id.* § 247.0011(a). The purpose of such care is to "enhance" the resident's "ability to age in place in a residential setting while receiving increasing or decreasing levels of service as the [resident's] needs change." *Id.* § 247.0011(c).

Chapter 247 refers to those receiving care from assisted living facilities as "residents," not as "patients." *Id.* § 247.0011(b).[6] Assisted living facilities must meet certain "resident care standards," "life safety code standards," and "physical plant standards," but the statute never mentions "medical care standards" or "health care standards." *Id.* § 247.021(d)(1)–(2), (g)(5). In fact, Chapter 247 never mentions "medical care" and refers to "health care" only when referring to "health care professionals" that assisted living facilities "may," but are not required to, have on staff. *See id.* §§ 247.002(1)(D)(i), .026(h), .029(c)(1), .067.

To understand the nature of assisted living facilities, it is helpful to contrast them with "convalescent and nursing facilities and related institutions," often referred to as "nursing homes," which are governed

---

[6] In all of Chapter 247, the term "patient" appears only twice, referring both times to "patients" or "clients" of the Texas Department of State Health Services, the Texas Department of Aging and Disability Services, a local mental-health authority, or a local intellectual and developmental disability authority, which may "refer" *their* "patient" or "client" to an assisted living facility. TEX. HEALTH & SAFETY CODE §§ 247.063(a), .065(b)(7). In relation to an assisted living facility, Chapter 247 refers to those who live there only as "residents."

by Chapter 242 of the Health and Safety Code. Like assisted living facilities, nursing facilities must provide "food and shelter to four or more persons who are unrelated to the proprietor of the establishment," but they must also provide "minor treatment *under the direction and supervision of a physician* licensed by the Texas Medical Board, or other services that meet some need beyond the basic provision of food, shelter, and laundry." *Id.* § 242.002(10) (emphasis added). Unlike assisted living facilities, nursing facilities must have on staff a "licensed nursing facility administrator," "at least one medical director who is licensed as a physician in this state," and "a director of nursing services who shall be a registered nurse." *Id.* §§ 242.015(a), .151(a), .153. Like Chapter 247, Chapter 242 refers to those living in a nursing facility as "residents," but unlike Chapter 247, Chapter 242 defines the term "resident" as "including a patient." *Id.* § 242.002(12).

Unlike assisted living facilities, nursing facilities must provide their residents with "the nursing care required to allow each resident to achieve and maintain the highest possible degree of function and independence *medically* possible." *Id.* § 242.154(a) (emphasis added). As we have previously held, nursing homes necessarily provide health care because they provide round-the-clock services, including physician examinations and pharmaceutical and dental services, by medical staff that includes physicians, nurses, nurse aides, and orderlies, according to a "comprehensive care plan to address the resident's medical, nursing, mental, psychosocial, and other needs." *Diversicare Gen. Partner, Inc. v. Rubio,* 185 S.W.3d 842, 849–50 (Tex. 2005). Chapter 242 and related regulations impose such requirements on nursing facilities, but (with

limited exceptions not applicable here) Chapter 242 "does not apply to an assisted living facility licensed under" Chapter 247. TEX. HEALTH & SAFETY CODE § 247.003(a). Indeed, standards adopted by the Health and Human Services Commission to protect the "health and safety" of residents in assisted living facilities must "clearly differentiate an assisted living facility from [a nursing facility] required to be licensed under Chapter 242." *Id.* § 247.026(b)(1).

All this is not to say that no assisted living facility ever provides "health care." As explained above, assisted living facilities qualify as health-care providers, and they do provide "health care" when they furnish treatment to a patient as part of a physician's provision of "medical care." *Gaytan*, 640 S.W.3d at 841. In addition to providing food, shelter, and personal-care services, for example, an assisted living facility "*may*" provide "assistance with or supervision of the administration of medication," "skilled nursing services" for certain "limited purposes," or certain "health maintenance activities," which involve "task[s] that require[] a *higher level of skill to perform than personal care services*." TEX. HEALTH & SAFETY CODE § 247.002(1)(C)–(E); 26 TEX. ADMIN. CODE §§ 553.3(33)(B), 553.7(b) (emphasis added). They *may* also provide "brain injury rehabilitation services," "personal care services to residents with Alzheimer's disease or related disorders," and "geriatric care." TEX. HEALTH & SAFETY CODE § 247.026(c), (c-1), (f). And they "*may*" employ a "health care professional," including "a physician, registered nurse, licensed vocational nurse, licensed dietitian, physical therapist, and occupational therapist," who is "licensed, certified, or otherwise authorized to administer *health care*."

*Id.* § 247.067(a), (b) (emphases added); *see also* 26 TEX. ADMIN. CODE § 553.3(32).

But assisted living facilities are not required to employ a health-care professional or to provide services other than personal-care services. Even those that do[7] "must not provide ongoing services to a resident that are comparable to the services available in a nursing facility licensed under" Chapter 242. 26 TEX. ADMIN. CODE § 553.261(c)(1). And those that don't provide only personal-care services, which qualify as "health care" only if they are provided as part of a physician's provision of "medical care." *Gaytan*, 640 S.W.3d at 841.

### III.
### DaySpring's Services

The record here establishes that DaySpring provided only personal-care services to Smith and did not provide those services as part of any physician's provision of medical care. As a result, DaySpring did not provide any health care to Smith as the TMLA defines that term, so Faber's claim cannot be a health care liability claim under either the health-care or "safety" prong.

DaySpring's executive director testified that DaySpring is "a *non-medical* community where residents can receive assistance with activities of daily living." [Emphasis added.] She explained that, with the exception of assisting some residents with medication

---

[7] Chapter 247 recognizes that there are "different types of assisted living facilities," TEX. HEALTH & SAFETY CODE § 247.048(2), but they differ based not on the level of care or types of services they provide, but on "the capability of the residents to evacuate the facility" in the case of an emergency. 26 TEX. ADMIN. CODE § 553.5(a).

11

administration, DaySpring provides only personal-care services, which means "assistance with the activities of daily living such as bathing, dressing, [and] ambulating." It employs only one licensed vocational nurse, but only to oversee the administration of medications for residents who need that service. It otherwise provides only personal-care services, relying on "caregivers" and nurse aides.

Smith was 87 years old when she moved into DaySpring. She had a history of several physical ailments, as well as a history of falls, but she was able to move around with a walker without assistance and did not require a wheelchair. Because of her risk of falling, her primary-care physician "recommended" *to Faber* that "she be in an assisted living [facility]."

A few months later, *Faber* made the decision to move Smith to DaySpring, not because of the physician's recommendation, but because a social worker told Faber that Medicare would not pay for fall-related treatment if she didn't move Smith to a "place where she would be watched." Faber initially arranged for Smith to stay at DaySpring for a few days, to see if it was a good fit. Smith "really liked" DaySpring because she "was a social person," so they decided she would move there a couple months later.

Before making the move, Faber met with DaySpring's executive director, director of resident care, and assistant director of resident care, none of whom are medical professionals, to discuss the assistance Smith would need. Together they completed a "Comprehensive Functional Assessment and Individual Service Plan" for Smith's stay at DaySpring. The plan noted that Smith had "health conditions" that were "unstable

chronic conditions where flare-ups may occur," but that she did not "require assistance for any special treatments or procedures" other than "blood pressure monitoring 2x week" and that she would not need assistance in administering her medications for those conditions. It further noted that she was fully oriented as to place and time, was alert with no impairment, and was able to participate in activities and events without assistance.

The Service Plan noted that Smith had fallen more than once in the preceding twelve months and that she required "staff to provide stand by assistance with bathing up to 3 times weekly." It also noted that she did not require assistance for hygiene and grooming, getting dressed, or laundry, was "totally independent" in "mobility" and "moving from place to place," and needed no assistance with "transfers," although she did require "resting areas intermittently throughout [the] residence." Faber testified that Smith needed assistance with "getting around from place to place," and DaySpring's executive director testified that Smith "was capable of walking by herself but long distances were difficult for her."

In addition to the Service Plan that Smith, Faber, and DaySpring completed, *Faber* provided DaySpring with a "Doctor's History & Physical Report," which Smith's primary-care physician had prepared a few days earlier. This physician was not employed by DaySpring, and its executive director did not know him from "any other patients or history." The Doctor's Report noted that Smith was an 87-year-old woman with a number of physical ailments, including "generalized osteoarthrosis" and a limited range-of-motion in her upper and lower

13

extremities. He observed that Smith walked "with a walker," had a "history of fall[s]," and required "assistance with ambulation." Nevertheless, he opined that Smith did not need skilled-nursing care and was capable of administering her medications independently, and that her needs could "be met at a *non-medical*, licensed assisted-living facility." [Emphasis added.] In a section describing the "treatment" Smith required, he prescribed medications for various ailments, diagnostic imaging, and a referral to a specialist for urological issues. He did not list or prescribe any "treatment" related to her "transfer and ambulation."

Importantly, Smith's file also contained a third document, which DaySpring required Smith and Faber to sign to confirm their understanding that DaySpring provided only personal-care services to assist with "routine living functions" and would not provide Smith with any "health care" services:

**NOTICE**
**THIS ASSISTED LIVING FACILITY**
**DOES NOT PROVIDE**
**NURSING CARE**

This facility is an assisted living facility; also known as a personal care facility. A personal care facility is . . . a facility which provides "acts of a protective nature. Personal care is understood to mean adult and responsible supervision or assistance with routine living functions in instances of a resident's condition necessitating such supervision or assistance."

> This is NOT a nursing home and *this facility does NOT provide nursing or other health care services (other than assistance with medication administration, if requested)* . . . . This facility DOES NOT provide nursing home services, which are defined as "Services provided by nursing personnel (include) observation; promotion and maintenance of health; prevention of illness and disability; management of health care during acute and chronic phases of illness; guidance and counseling of individuals and families; and referral to physicians, other health care providers, and community resources when appropriate."
>
> **BY SIGNING BELOW, I CERTIFY THAT I HAVE READ AND UNDERSTOOD THE CONTENTS OF THIS NOTICE.**

[Italics added.]

Nevertheless, DaySpring now argues that it was providing "health care" to Smith when its personal-care attendant pushed her backwards over a broken sidewalk in a rolling walker, and the Court agrees. But the record does not establish that DaySpring's services to assist Smith to her daughter's vehicle were provided as part of a physician's provision of medical care.

Because DaySpring did not itself provide medical care or health care and instead provided only personal-care services, the Court focuses on the fact that Smith's physician recommended to Faber that Smith "move to" an assisted living facility. *See ante* at 17. In the Court's view, this "recommendation" creates a sufficient substantive nexus between the medical care that Smith's physician provided to her and the safety

15

standards that governed DaySpring's provision of personal-care services. This view directly contradicts our recognition in *Ross* that "the Legislature did not intend for the expert report requirement to apply to every claim for conduct that occurs in a health care context." 462 S.W.3d at 502. To the contrary, a "safety standards-based claim does not come within the TMLA's provisions just because the underlying occurrence took place in a health care facility, the claim is against a health care provider, or both." *Id.* at 503. Instead, "the safety standards referred to in the definition are those that have a substantive relationship with the providing of medical or health care." *Id.* at 504. Otherwise, "the broad meaning of 'safety' would afford defendant health care providers a special procedural advantage in the guise of requiring plaintiffs to file expert reports in their suits regardless of whether their cause of action implicated the provision of medical or health care." *Id.*

By finding a "substantive nexus" based merely on a doctor's recommendation that his patient move into a facility that expressly does not provide health care and instead provides only personal-care services, the Court today promotes the very "arbitrary results" we sought to avoid in *Ross*. *Id.* Smith's primary-care physician merely "recommended" to Faber that Smith move into an assisted living facility and noted that she needed assistance with ambulating. He did not order or emphasize that she move or that she receive such services, and he agreed that her needs could "be met at a *non-medical*, licensed assisted-living facility." [Emphasis added.] Concluding that DaySpring provided "health care" because of the physician's recommendation would be like concluding that a restaurant provides health care to a patron whose physician

16

recommended he eat better. Smith's physician had no prior or ongoing relationship with DaySpring, did not recommend DaySpring specifically, and exerted no supervision over the personal-care services it provided to Smith. Further, Smith waited several months after this recommendation to actually move into the facility and only did so after her daughter received information that moving into a facility might be necessary for continued Medicare coverage.

Even accepting that an outside physician's recommendation *could* be enough to support a substantive nexus, an application of the *Ross* factors confirms that no substantive nexus exists between the physician's medical care for Smith and the safety standards that DaySpring allegedly violated.[8] Smith was a "resident" of DaySpring, not

---

[8] The *Ross* factors are:

1. Did the alleged negligence of the defendant occur in the course of the defendant's performing tasks with the purpose of protecting *patients* from harm;

2. Did the injuries occur in a place where *patients* might be during the time they were receiving care, so that the obligation of the provider to protect persons who require *special, medical care* was implicated;

3. At the time of the injury was the claimant in the process of seeking or receiving *health care*;

4. At the time of the injury was the claimant providing or assisting in providing *health care*;

5. Is the alleged negligence based on safety standards arising from professional duties owed by the *health care* provider;

6. If an instrumentality was involved in the defendant's alleged negligence, was it a type used in providing *health care*; or

a "patient," DaySpring did not provide any "health care" to Smith, and DaySpring's obligation to maintain its sidewalks protects not patients but rather the general public. *See, e.g.*, *id.* at 505 (holding that the hospital's maintenance of its lobby floor was not "for the purpose of protecting patients" but to protect the general public).[9] And the Service Plan completed when Smith entered the facility noted that she was "totally independent" in "mobility" and "moving from place to place," and needed no assistance with "transfers."[10]

---

7. Did the alleged negligence occur in the course of the defendant's taking action or failing to take action necessary to comply with safety-related requirements set for *health care* providers by governmental or accrediting agencies?

*Ross*, 462 S.W.3d at 505 (emphases added).

[9] The Court cites Department of Aging and Disability Services Administrative Rule 46.41 for the proposition that DaySpring was required to assist Smith with service-plan activities "related to the care of [her] physical health," which in Smith's case included "ambulating." *Ante* at 19–20 (citing 40 TEX. ADMIN. CODE § 46.41(b)(1)(H)). But Chapter 46 of Title 40 applies only to an assisted living facility that contracts with the government to provide care to clients of the Texas Department of Human Services Community Based Alternatives Assisted Living/Residential Care Program or the Community Care for the Aged and Disabled Residential Care Program. *See* 40 TEX. ADMIN. CODE § 46.1. Chapter 46 is inapplicable here. The record contains no evidence that DaySpring entered into or provided services to Smith under any such contract. Thus, these regulations cannot support the idea that DaySpring was assisting with activities "related to the client's physical health." *Id.* § 46.41(b)(1).

[10] The Court relies on a different set of intake paperwork that indicated Smith had trouble ambulating independently and required standby assistance. *Ante* at 18. However, this paperwork was completed several months before Smith permanently moved into the facility. I rely on the paperwork completed just a short time before the accident as the most reliable indicator of Smith's needs at the time she moved into the facility. That intake assessment rated Smith as "totally independent."

18

The Court's focus on "safety" does not justify its conclusion that a substantive nexus is present here. Contrary to the Court's characterization, Chapter 247 and the rules that govern assisted living facilities, such as the sidewalk requirements, never describe their "safety" standards as "standards of health care." *Ante* at 14 & n.6, 16. Instead, they require compliance with "life safety standards" and "physical plant standards," TEX. HEALTH & SAFETY CODE § 247.021(d-2); 26 TEX. ADMIN. CODE § 553.23(d), and define the term "safety" to refer generally to "[p]rotection from injury or loss of life due to such conditions as fire, electrical hazard, *unsafe building or site conditions*, and the hazardous presence of toxic fumes and materials," 26 TEX. ADMIN. CODE § 553.3(74) (emphasis added).

The regulatory standard on which the Court relies, which requires assisted living facilities to "ensure a ramp, walk, or step is of slip-resistant texture and is uniform, without irregularities," 26 TEX. ADMIN. CODE § 553.103(d)(2), is simply a "physical plant" standard. This standard is listed with others, like ensuring the facility is served by a firefighting unit, has adequate parking, has guardrails and handrails where needed, is "maintained in good condition and kept free of rubbish, garbage, and unintended growth," has sufficient water drainage, and (in some cases) is not located in a 100-year floodplain. *Id.* § 553.103. These are general physical plant standards that apply regardless of whether the assisted living facility chooses to provide health care, not standards that specifically govern a facility's provision of health care as the Court asserts. *See ante* at 16, 22 n.16; *see also Reddic*, 474 S.W.3d at 675–76 (holding that safety standards requiring a hospital to eliminate general

19

safety risks and maintain the hospital grounds did not have or create a sufficient nexus to health care to qualify a visitor's premises-liability claim as a health care liability claim). Because DaySpring does not provide health care, the safety standards that govern it have no substantive nexus to health care.

The Court also considers Dayspring's regulatory duty to safely provide ambulatory assistance to its residents. *See ante* at 18 & n.13. But DaySpring's service plan for Smith did not include any services provided as part of a physician's provision of medical care. An assisted living facility's "service plan" is simply a "written description of the medical care, supervision, *or nonmedical care* needed by a resident." 26 TEX. ADMIN. CODE § 553.3(76) (emphasis added). As explained, assisted living facilities "may" provide medical care or health care, and when they do those service plans must describe that care, but that was not the case here. And although the Court repeatedly identifies the walker—in its words, "an instrumentality used in providing healthcare," *ante* at 23—as an operative fact underlying Faber's claim, the walker was Smith's own walker and was not provided by DaySpring or her physician.

Under this record, even analyzing this case under the supposition that a physician's remote recommendation that a patient should move to a facility *could* provide a sufficient substantive nexus to healthcare, DaySpring failed to demonstrate that it did so here.

20

## IV.
## Conclusion

Because nothing in this record establishes that DaySpring provided any services as part of a physician's provision of medical care to Smith, DaySpring did not provide Smith with any "health care" as the TMLA defines that term. Faber's claim therefore does not assert a departure from accepted standards of health care or from accepted standards of "safety" having a "substantive nexus" to health care. And because Smith was not a patient receiving health care from DaySpring, the *Ross* factors are not satisfied here. As a result, Faber's claim does not qualify as a health care liability claim under the TMLA, and I must respectfully dissent.

_____
Jeffrey S. Boyd
Justice

**OPINION FILED:** June 30, 2023

21